# YBARRA *v.* ILLINOIS

No. 78–5937. Argued October 9, 1979—Decided November 28, 1979

86

STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post,* p. 96. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN, J., joined, *post,* p. 98.

*Alan D. Goldberg* argued the cause *pro hac vice* for appellant. With him on the briefs were *Ralph Ruebner* and *Mary Robinson.*

*Melbourne A. Noel, Jr.,* Assistant Attorney General of Illinois, argued the cause for appellee. With him on the brief were *William J. Scott,* Attorney General, and *Donald B. Mackay,* Assistant Attorney General.*

MR. JUSTICE STEWART delivered the opinion of the Court.

An Illinois statute authorizes law enforcement officers to detain and search any person found on premises being searched pursuant to a search warrant, to protect themselves from attack or to prevent the disposal or concealment of anything described in the warrant.[1] The question before us is whether the application of this statute to the facts of the present case violated the Fourth and Fourteenth Amendments.

## I

On March 1, 1976, a special agent of the Illinois Bureau of Investigation presented a "Complaint for Search Warrant" to a judge of an Illinois Circuit Court. The complaint recited that the agent had spoken with an informant known to the police to be reliable and:

> "3. The informant related . . . that over the weekend of 28 and 29 February he was in the [Aurora Tap Tavern, located in the city of Aurora, Ill.] and observed fif-

---

*Laurance S. Smith* filed a brief for the State Public Defender of California as *amicus curiae* urging reversal.

*Fred E. Inbau, Wayne W. Schmidt, Frank G. Carrington, Jr., James P. Manak, Richard J. Brzeczek, Mike Greely,* Attorney General of Montana, and *Marc F. Racicot,* Assistant Attorney General, filed a brief for Americans for Effective Law Enforcement, Inc., et al., as *amici curiae* urging affirmance.

[1] The statute in question is Ill. Rev. Stat., ch. 38, § 108–9 (1975), which provides in full:

"In the execution of the warrant the person executing the same may reasonably detain to search any person in the place at the time:

"(a) To protect himself from attack, or

"(b) To prevent the disposal or concealment of any instruments, articles or things particularly described in the warrant."

teen to twenty-five tin-foil packets on the person of the bartender 'Greg' and behind the bar. He also has been in the tavern on at least ten other occasions and has observed tin-foil packets on 'Greg' and in a drawer behind the bar. The informant has used heroin in the past and knows that tin-foil packets are a common method of packaging heroin.

"4. The informant advised . . . that over the weekend of 28 and 29 February he had a conversation with 'Greg' and was advised that 'Greg' would have heroin for sale on Monday, March 1, 1976. This conversation took place in the tavern described."

On the strength of this complaint, the judge issued a warrant authorizing the search of "the following person or place: . . . [T]he Aurora Tap Tavern. . . . Also the person of 'Greg', the bartender, a male white with blondish hair appx. 25 years." The warrant authorized the police to search for "evidence of the offense of possession of a controlled substance," to wit, "[h]eroin, contraband, other controlled substances, money, instrumentalities and narcotics, paraphernalia used in the manufacture, processing and distribution of controlled substances."

In the late afternoon of that day, seven or eight officers proceeded to the tavern. Upon entering it, the officers announced their purpose and advised all those present that they were going to conduct a "cursory search for weapons." One of the officers then proceeded to pat down each of the 9 to 13 customers present in the tavern, while the remaining officers engaged in an extensive search of the premises.

The police officer who frisked the patrons found the appellant, Ventura Ybarra, in front of the bar standing by a pinball machine. In his first patdown of Ybarra, the officer felt what he described as "a cigarette pack with objects in it." He did not remove this pack from Ybarra's pocket. Instead, he moved on and proceeded to pat down other customers.

After completing this process the officer returned to Ybarra and frisked him once again. This second search of Ybarra took place approximately 2 to 10 minutes after the first. The officer relocated and retrieved the cigarette pack from Ybarra's pants pocket. Inside the pack he found six tinfoil packets containing a brown powdery substance which later turned out to be heroin.

Ybarra was subsequently indicted by an Illinois grand jury for the unlawful possession of a controlled substance. He filed a pretrial motion to suppress all the contraband that had been seized from his person at the Aurora Tap Tavern. At the hearing on this motion the State sought to justify the search by reference to the Illinois statute in question. The trial court denied the motion to suppress, finding that the search had been conducted under the authority of subsection (b) of the statute, to "prevent the disposal or concealment of [the] things particularly described in the warrant." The case proceeded to trial before the court sitting without a jury, and Ybarra was found guilty of the possession of heroin.

On appeal, the Illinois Appellate Court held that the Illinois statute was not unconstitutional "in its application to the facts" of this case. 58 Ill. App. 3d 57, 64, 373 N. E. 2d 1013, 1017. The court acknowledged that, had the warrant directed that a "large retail or commercial establishment" be searched, the statute could not constitutionally have been read to "authorize a 'blanket search' of persons or patrons found" therein. *Id.,* at 62, 373 N. E. 2d, at 1016. The court interpreted the statute as authorizing the search of persons found on premises described in a warrant only if there is "some showing of a connection with those premises, that the police officer reasonably suspected an attack, or that the person searched would destroy or conceal items described in the warrant." *Id.,* at 61, 373 N. E. 2d, at 1016. Accordingly, the State Appellate Court found that the search of Ybarra had been constitutional because it had been "conducted in a

one-room bar where it [was] obvious from the complaint . . . that heroin was being sold or dispensed," *id.*, at 62, 373 N. E. 2d, at 1016, because "the six packets of heroin . . . could easily [have been] concealed by the defendant and thus thwart the purpose of the warrant," *id.*, at 61, 373 N. E. 2d, at 1016, and because Ybarra was not an "innocent strange[r] having no connection with the premises," *ibid.* The court, therefore, affirmed Ybarra's conviction, and the Illinois Supreme Court denied his petition for leave to appeal. There followed an appeal to this Court, and we noted probable jurisdiction. 440 U. S. 790.

## II

There is no reason to suppose that, when the search warrant was issued on March 1, 1976, the authorities had probable cause to believe that any person found on the premises of the Aurora Tap Tavern, aside from "Greg," would be violating the law.[2] The search warrant complaint did not allege that the bar was frequented by persons illegally purchasing drugs. It did not state that the informant had ever seen a patron of the tavern purchase drugs from "Greg" or from any other person. Nowhere, in fact, did the complaint even mention the patrons of the Aurora Tap Tavern.

Not only was probable cause to search Ybarra absent at the time the warrant was issued, it was still absent when the police executed the warrant. Upon entering the tavern, the

---

[2] The warrant issued on March 1, 1976, did not itself authorize the search of Ybarra or of any other patron found on the premises of the Aurora Tap Tavern. It directed the police to search "the following person or place: . . . the Aurora Tap Tavern. . . . Also the person of 'Greg'. . . ." Had the issuing judge intended that the warrant would or could authorize a search of every person found within the tavern, he would hardly have specifically authorized the search of "Greg" alone. "Greg" was an employee of the tavern, and the complaint upon which the search warrant was issued gave every indication that he would be present at the tavern on March 1.

police did not recognize Ybarra and had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law. Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers. In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed.[3]  But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron* v. *New York,* 392 U. S. 40, 62–63. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places. See *Rakas* v. *Illinois,* 439 U. S. 128, 138–143, 148–149; *Katz* v. *United States,* 389 U. S. 347, 351–352.

Each patron who walked into the Aurora Tap Tavern on March 1, 1976, was clothed with constitutional protection against an unreasonable search or an unreasonable seizure. That individualized protection was separate and distinct from

---

[3] Ybarra concedes that the warrant issued on March 1, 1976, was supported by probable cause insofar as it purported to authorize a search of the premises of the Aurora Tap Tavern and a search of the person of "Greg," the bartender.

the Fourth and Fourteenth Amendment protection possessed by the proprietor of the tavern or by "Greg." Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search "Greg," it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers.[4]

Notwithstanding the absence of probable cause to search Ybarra, the State argues that the action of the police in searching him and seizing what was found in his pocket was nonetheless constitutionally permissible. We are asked to find that the first patdown search of Ybarra constituted a reasonable frisk for weapons under the doctrine of *Terry* v. *Ohio,* 392 U. S. 1. If this finding is made, it is then possible to conclude, the State argues, that the second search of Ybarra was constitutionally justified. The argument is that the patdown yielded probable cause to believe that Ybarra was carrying narcotics, and that this probable cause constitutionally supported the second search, no warrant being required in light of the exigencies of the situation coupled with the ease with which Ybarra could have disposed of the illegal substance.

We are unable to take even the first step required by this argument. The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently

---

[4] The Fourth Amendment directs that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." Thus, "open-ended" or "general" warrants are constitutionally prohibited. See *Lo–Ji Sales, Inc.* v. *New York,* 442 U. S. 319; *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, 311; *United States* v. *Chadwick,* 433 U. S. 1, 7–8; *Stanford* v. *Texas,* 379 U. S. 476, 480–482. It follows that a warrant to search a place cannot normally be construed to authorize a search of each individual in that place. The warrant for the Aurora Tap Tavern provided no basis for departing from this general rule. Consequently, we need not consider situations where the warrant itself authorizes the search of unnamed persons in a place and is supported by probable cause to believe that persons who will be in the place at the time of the search will be in possession of illegal drugs.

dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons.[5] *Adams* v. *Williams,* 407 U. S. 143, 146; *Terry* v. *Ohio, supra,* at 21–24, 27. When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most Agent Johnson could point to was that Ybarra was wearing a ¾-length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." [6] Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. See, *e. g., Adams* v. *Williams, supra* (at night, in high-crime district, lone police officer approached person believed by officer to possess gun and narcotics). Nothing in *Terry* can be understood to allow a generalized

---

[5] Since we conclude that the initial patdown of Ybarra was not justified under the Fourth and Fourteenth Amendments, we need not decide whether or not the presence on Ybarra's person of "a cigarette pack with objects in it" yielded probable cause to believe that Ybarra was carrying any illegal substance.

[6] *Dunaway* v. *New York,* 442 U. S. 200, 210.

"cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

What has been said largely disposes of the State's second and alternative argument in this case. Emphasizing the important governmental interest "in effectively controlling traffic in dangerous, hard drugs" and the ease with which the evidence of narcotics possession may be concealed or moved around from person to person, the State contends that the *Terry* "reasonable belief or suspicion" standard should be made applicable to aid the evidence-gathering function of the search warrant. More precisely, we are asked to construe the Fourth and Fourteenth Amendments to permit evidence searches of persons who, at the commencement of the search, are on "compact" premises subject to a search warrant, at least where the police have a "reasonable belief" that such persons "are connected with" drug trafficking and "may be concealing or carrying away the contraband."

Over 30 years ago, the Court rejected a similar argument in *United States* v. *Di Re,* 332 U. S. 581, 583–587. In that case, a federal investigator had been told by an informant that a transaction in counterfeit gasoline ration coupons was going to occur at a particular place. The investigator went to that location at the appointed time and saw the car of one of the suspected parties to the illegal transaction. The investigator went over to the car and observed a man in the driver's seat, another man (Di Re) in the passenger's seat, and the informant in the back. The informant told the investigator that the person in the driver's seat had given him counterfeit coupons. Thereupon, all three men were arrested and searched. Among the arguments unsuccessfully advanced by the Government to support the constitutionality of the search of Di Re was the contention that the investigator could

lawfully have searched the car, since he had reasonable cause to believe that it contained contraband, and correspondingly could have searched any occupant of the car because the contraband sought was of the sort "which could easily be concealed on the person." [7]  Not deciding whether or not under the Fourth Amendment the car could have been searched, the Court held that it was "not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." [8]

The *Di Re* case does not, of course, completely control the case at hand.  There the Government investigator was proceeding without a search warrant, and here the police possessed a warrant authorizing the search of the Aurora Tap Tavern.  Moreover, in *Di Re* the Government conceded that its officers could not search all the persons in a house being searched pursuant to a search warrant.[9]  The State makes no such concession in this case.  Yet the governing principle in both cases is basically the same, and we follow that principle today.  The "long-prevailing" constitutional standard of probable cause embodies " 'the best compromise that has been found for accommodating [the] often opposing interests' in 'safeguard[ing] citizens from rash and unreasonable inter-

---

[7] 332 U. S., at 586.

[8] *Id.*, at 587.

[9] "The Government says it would not contend that, armed with a search warrant for a residence only, it could search all persons found in it.  But an occupant of a house could be used to conceal this contraband on his person quite as readily as can an occupant of a car.  Necessity, an argument advanced in support of this search, would seem as strong a reason for searching guests of a house for which a search warrant had issued as for search of guests in a car for which none had been issued.  By a parity of reasoning with that on which the Government disclaims the right to search occupants of a house, we suppose the Government would not contend that if it had a valid search warrant for the car only it could search the occupants as an incident to its execution.  How then could we say that the right to search a car without a warrant confers greater latitude to search occupants than a search by warrant would permit?" *Ibid.*

ferences with privacy' and in 'seek[ing] to give fair leeway for enforcing the law in the community's protection.' " [10]

For these reasons, we conclude that the searches of Ybarra and the seizure of what was in his pocket contravened the Fourth and Fourteenth Amendments.[11] Accordingly, the judgment is reversed, and the case is remanded to the Appellate Court of Illinois, Second District, for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

I join MR. JUSTICE REHNQUIST's dissent since I cannot subscribe to the Court's unjustifiable narrowing of the rule of

---

[10] *Dunaway* v. *New York,* 442 U. S., at 208, quoting *Brinegar* v. *United States,* 338 U. S. 160, 176.

The circumstances of this case do not remotely approach those in which the Court has said that a search may be made on less than probable cause. In addition to *Terry* v. *Ohio,* 392 U. S. 1, see, *e. g., Delaware* v. *Prouse,* 440 U. S. 648; *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307; *United States* v. *Martinez-Fuerte,* 428 U. S. 543; *South Dakota* v. *Opperman,* 428 U. S. 364; *United States* v. *Brignoni-Ponce,* 422 U. S. 873; *United States* v. *Biswell,* 406 U. S. 311; *Camara* v. *Municipal Court,* 387 U. S. 523.

[11] Our decision last Term in *Michigan* v. *DeFillippo,* 443 U. S. 31, does not point in a different direction. There we held that the Fourth and Fourteenth Amendments had not been violated by an arrest based on a police officer's probable cause to believe that the suspect had committed or was committing a substantive criminal offense, even though the statute creating the offense was subsequently declared unconstitutional. Here, the police officers acted on the strength of Ill. Rev. Stat., ch. 38, § 108-9 (1975), but that statute does not define the elements of a substantive criminal offense under state law. The statute purports instead to authorize the police in some circumstances to make searches and seizures without probable cause and without search warrants. This state law, therefore, falls within the category of statutes purporting to authorize searches without probable cause, which the Court has not hesitated to hold invalid as authority for unconstitutional searches. See, *e. g., Torres* v. *Puerto Rico,* 442 U. S. 465; *Almeida-Sanchez* v. *United States,* 413 U. S. 266; *Sibron* v. *New York,* 392 U. S. 40; *Berger* v. *New York,* 388 U. S. 41.

*Terry* v. *Ohio*, 392 U. S. 1 (1968). The Court would require a particularized and individualized suspicion that a person is armed and dangerous as a condition to a *Terry* search. This goes beyond the rationale of *Terry* and overlooks the practicalities of a situation which no doubt often confronts officers executing a valid search warrant. The Court's holding is but another manifestation of the practical poverty of the judge-made exclusionary rule. "The suppression of truth is a grievous necessity at best, more especially when as here the inquiry concerns the public interest; it can be justified at all only when the opposed private interest is supreme." *McMann* v. *SEC*, 87 F. 2d 377, 378 (CA2 1937) (L. Hand, J.). Here, the Court's holding operates as but a further hindrance on the already difficult effort to police the narcotics traffic which takes such a terrible toll on human beings.

These officers had validly obtained a warrant to search a named person and a rather small, one-room tavern for narcotics. Upon arrival, they found the room occupied by 12 persons. Were they to ignore these individuals and assume that all were unarmed and uninvolved? Given the setting and the reputation of those who trade in narcotics, it does not go too far to suggest that they might pay for such an easy assumption with their lives. The law does not require that those executing a search warrant must be so foolhardy. That is precisely what Mr. Chief Justice Warren's opinion in *Terry* stands for. Indeed, the *Terry* Court recognized that a balance must be struck between the privacy interest of individuals and the safety of police officers in performing their duty. I would hold that when police execute a search warrant for narcotics in a place of known narcotics activity they may protect themselves by conducting a *Terry* search. They are not required to assume that they will not be harmed by patrons of the kind of establishment shown here, something quite different from a ballroom at the Waldorf. "The officer need not be absolutely certain that the individual is armed; the issue is

whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry* v. *Ohio, supra,* at 27.

I do not find it controlling that the heroin was not actually retrieved from appellant until the officer returned after completing the first search. The "cigarette pack with objects in it" was noticed in the first search. In the "second search," the officer did no more than return to the appellant and retrieve the pack he had already discovered. That there was a delay of minutes between the search and the seizure is not dispositive in this context, where the searching officer made the on-the-spot judgment that he need not seize the suspicious package immediately. He could first reasonably make sure that none of the patrons was armed before returning to appellant. Thus I would treat the second search and its fruits just as I would had the officer taken the pack immediately upon noticing it, which plainly would have been permissible.

Under this analysis, I need not reach the validity of the Illinois statute under which the Illinois court sustained the search. Parenthetically, I find the Court's failure to pass on the Illinois statute puzzling in light of the Court's holding that the searches were not authorized by *Terry*.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

On March 1, 1976, agents of the Illinois Bureau of Investigation executed a search warrant in the Aurora Tap Tavern in Aurora, Ill. The warrant was based on information given by a confidential informant who said that he had seen heroin on the person of the bartender and in a drawer behind the bar on at least 10 occasions. Moreover, the informant advised the affiant that the bartender would have heroin for sale on March 1. The warrant empowered the police to search the Aurora Tap and the person of "Greg," the bartender.

When police arrived at the Aurora Tap, a drab, dimly lit tavern, they found about a dozen or so persons standing or

sitting at the bar. The police announced their purpose and told everyone at the bar to stand for a patdown search. Agent Jerome Johnson, the only officer to testify in the proceedings below, explained that the initial search was a frisk for weapons to protect the officers executing the warrant. Johnson frisked several patrons, including appellant Ybarra. During this patdown, Johnson felt "a cigarette pack with objects in it" in Ybarra's front pants pocket. He finished frisking the other patrons and then returned to Ybarra. At that time, he frisked Ybarra once again, reached into Ybarra's pocket, and removed the cigarette package that he had felt previously. The package, upon inspection, confirmed the officer's previously aroused suspicion that it contained not cigarettes but packets of heroin.

Confronted with these facts, the Court concludes that the police were without authority under the warrant to search any of the patrons in the tavern and that, absent probable cause to believe that Ybarra possessed contraband, the search of his person violated the Fourth and Fourteenth Amendments. Because I believe that this analysis is faulty, I dissent.

The first question posed by this case is the proper scope of a policeman's power to search pursuant to a valid warrant. This Court has had very few opportunities to consider the scope of such searches. An early case, *Marron* v. *United States*, 275 U. S. 192 (1927), held that police could not seize one thing under a search warrant describing another thing. See also *Steele* v. *United States*, 267 U. S. 498 (1925) (warrant authorizing search of building used as a garage empowers police to search connecting rooms). Three other cases, *Berger* v. *New York*, 388 U. S. 41 (1967); *United States* v. *Kahn*, 415 U. S. 143 (1974); and *United States* v. *Donovan*, 429 U. S. 413 (1977), examined the scope of a warrant in the context of electronic surveillance. A number of cases involving warrantless searches have offered dicta on the subject of searches pursuant to a warrant. See, *e. g., Bivens* v. *Six*

*Unknown Fed. Narcotics Agents,* 403 U. S. 388, 394, n. 7 (1971) (Fourth Amendment confines officer executing a warrant "strictly within the bounds set by the warrant"). Closest for our purposes, though concededly not dispositive, is *United States* v. *Di Re,* 332 U. S. 581, 587 (1948), a case involving the warrantless search of an occupant of an automobile. In that case the Court suggested that police, "armed with a search warrant for a residence only," could not search "all persons found" in the residence.

Faced with such a dearth of authority, it makes more sense than ever to begin with the language of the Fourth Amendment itself:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

As often noted, the Amendment consists of two independent clauses joined by the conjunction "and." See, *e. g., Go-Bart Co.* v. *United States,* 282 U. S. 344, 356–357 (1931). The first clause forbids "unreasonable searches and seizures" of "persons, houses, papers, and effects. . . . " The second clause describes the circumstances under which a search warrant or arrest warrant may issue, requiring specification of the place to be searched as well as the persons or things to be seized.

Much of the modern debate over the meaning of the Fourth Amendment has focused on the relationship between the reasonableness requirement and the warrant requirement. In particular, the central question has been whether and under what circumstances the police are entitled to conduct "reasonable" searches without first securing a warrant. As this Court has summarized:

> "Some have argued that a determination by a magistrate of probable cause as a precondition of any search or

seizure is so essential that the Fourth Amendment is violated whenever the police might reasonably have obtained a warrant but failed to do so. Others have argued with equal force that a test of reasonableness, applied after the fact of search or seizure when the police attempt to introduce the fruits in evidence, affords ample safeguard for the rights in question, so that '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' " *Coolidge* v. *New Hampshire*, 403 U. S. 443, 474 (1971), quoting *United States* v. *Rabinowitz*, 339 U. S. 56, 66 (1950).

MR. JUSTICE STEWART explained the current accommodation of the two clauses in *Katz* v. *United States*, 389 U. S. 347, 357 (1967): "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." See also *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 219 (1973).

Here, however, we must look to the language of the Fourth Amendment to answer a wholly different question: whether and under what circumstances the police may search a person present at the place named in a warrant. In this regard, the second clause of the Amendment, by itself, offers no guidance. It is merely a set of standards that must be met before a search warrant or arrest warrant may "issue." The restrictions on a policeman's authority to search pursuant to a warrant derive, of course, from the first clause of the Amendment, which prohibits all "unreasonable" searches, whether those searches are pursuant to a warrant or not. See *Go-Bart Co.* v. *United States, supra,* at 357. Reading the two clauses together, we can infer that some searches or seizures are *per se* unreasonable: searches extending beyond the place specified, cf. *Steele* v. *United States, supra,* or seizures of

persons or things other than those specified. Cf. *Marron* v. *United States,* 275 U. S. 192 (1927). No such presumption is available to Ybarra here, however, because the second clause of the Amendment does not require the warrant to specify the "persons" to be searched.[1] As this Court has noted in the context of electronic surveillance, " '[t]he Fourth Amendment requires a warrant to describe only "the place to be searched, and the persons or things to be seized," not the persons from whom things will be seized.' " *United States* v. *Kahn,* 415 U. S., at 155, n. 15, quoting *United States* v. *Fiorella,* 468 F. 2d 688, 691 (CA2 1972).[2]

Nor, as a practical matter, could we require the police to specify in advance all persons that they were going to search at the time they execute the warrant. A search warrant is, by definition, an anticipatory authorization. The police must offer the magistrate sufficient information to confine the search but must leave themselves enough flexibility to react reasonably to whatever situation confronts them when they enter the premises. An absolute bar to searching persons not named in the warrant would often allow a person to frustrate the search simply by placing the contraband in his pocket. I cannot subscribe to any interpretation of the Fourth Amendment that would support such a result, and I doubt that this Court would sanction it if that precise fact situation were before it.

Recognizing that the authority to search premises must, under some circumstances, include the authority to search

---

[1] Technically, the police must temporarily "seize" a person before they can search him. Such incidental seizures, however, never have been nor could be subjected to the warrant requirement. See *Terry* v. *Ohio,* 392 U. S. 1, 20 (1968). See also *infra,* at 104–105.

[2] The failure of the Fourth Amendment to require specification of the persons to be searched does not, of course, prohibit such specification. Thus, in the present case, the warrant specifically authorized the police to search Greg, the bartender.

persons present on those premises,[3] courts and legislatures have struggled to define the precise contours of that power. Some courts, for example, have required an indication that the person searched had a "connection" with the premises. See, e. g., Purkey v. Maby, 33 Idaho 281, 193 P. 79 (1920); State v. Massie, 95 W. Va. 233, 120 S. E. 514 (1923). These courts do not explain, however, what form that connection must take or how it might manifest itself to the police. Some States have relied on the Uniform Arrest Act, which allows police executing a warrant to detain and question a suspicious person for up to two hours. See, e. g., State v. Wise, 284 A. 2d 292 (Del. Super. 1971). Proponents of this approach fail to explain, however, how detention for questioning will produce any hidden contraband. Moreover, in light of the Fourth Amendment's requirement that the warrant specify the person to be "seized," it is at least arguable that this approach substitutes a greater constitutional intrusion for a lesser. Several other States, Illinois included, have simply passed over the constitutional question by identifying the permissible purposes for a search without specifying the circumstances under which that search can be conducted. Illinois' provision, for example, permits an officer to search persons present on the named premises

"(a) To protect himself from attack, or

"(b) To prevent the disposal or concealment of any instruments, articles or things particularly described in the warrant." Ill. Rev. Stat., ch. 38, § 108–9 (1975).

The generality of these attempts to define the proper limits of such searches does not mean, of course, that no limits exist.

[3] As even a critic of the approach employed by the court below admitted, "a realistic appraisal of the situation facing the officer executing a search warrant compels the conclusion that under some circumstances a right to search occupants of the place named in the warrant is essential." LaFave, Search and Seizure: "The Course of True Law . . . Has Not . . . Run Smooth," 1966 Law Forum 255, 272.

A person does not forfeit the protection of the Fourth Amendment merely because he happens to be present during the execution of a search warrant. To define those limits, however, this Court need look no further than the first clause of that Amendment and need ask no question other than whether, under all the circumstances, the actions of the police in executing the warrant were reasonable. Significantly, the concept of reasonableness in this context is different from the prevailing concept of reasonableness in the context of warrantless searches. In that latter context, as noted earlier, there is a tension between giving full scope to the authority of police to make reasonable searches and the inferred requirement that the police secure a judicial approval in advance of a search. In the past we have resolved that tension by allowing "jealously and carefully drawn" exceptions to the warrant requirement. See *Jones* v. *United States,* 357 U. S. 493, 499 (1958); *Katz* v. *United States,* 389 U. S., at 357. The rationale for drawing these exceptions closely is obvious. Loosely drawn, they could swallow the warrant requirement itself.

In this case, however, the warrant requirement has been fully satisfied. As a result, in judging the reasonableness of the search pursuant to the warrant, we need not measure it against jealously drawn exceptions to that requirement. Only once before, to my knowledge, has this Court been relieved of concern for the warrant requirement to the extent that we could give full scope to the notion of reasonableness. In *Terry* v. *Ohio,* 392 U. S. 1 (1968), this Court considered the applicability of the Fourth Amendment to an on-the-street encounter between a policeman and three men who had aroused his suspicions. In upholding the ensuing "stop and frisk," this Court found the warrant requirement completely inapposite because "on-the-spot" interactions between police and citizens "historically [have] not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.,* at 20. The conduct in question had to be judged solely

under "the Fourth Amendment's general proscription against unreasonable searches and seizures." *Ibid.*

The petitioner in *Terry* had sought a "rigid all-or-nothing model of justification and regulation under the [Fourth] Amendment," a model allowing the police to search some individuals completely and other individuals not at all. Such a model, however, would have overlooked "the utility of limitations upon the scope, as well as the initiation, of police actions as a means of constitutional regulation." *Id.*, at 17. This Court, therefore, opted for a flexible model balancing the scope of the intrusion against its justification:

> "In order to assess the reasonableness of [the challenged search] as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Id.*, at 20–21, quoting *Camara* v. *Municipal Court*, 387 U. S. 523, 534–535, 536–537 (1967).

In the present case, Ybarra would have us eschew such flexibility in favor of a rule allowing the police to search only those persons on the premises for whom the police have probable cause to believe that they possess contraband. Presumably, such a belief would entitle the police to search those persons completely. But such a rule not only reintroduces the rigidity condemned in *Terry*, it also renders the existence of the search warrant irrelevant. Given probable cause to believe that a person possesses illegal drugs, the police need no warrant to conduct a full body search. They need only arrest that person and conduct the search incident to that arrest. See *Chimel* v. *California*, 395 U. S. 752, 763 (1969). It should not matter, of course, whether the arrest precedes the search or vice versa. See, *e. g.*, *United States* v. *Gorman*, 355

F. 2d 151, 159 (CA2 1965), cert. denied, 384 U. S. 1024 (1966) ;
*Holt* v. *Simpson,* 340 F. 2d 853, 856 (CA7 1965).

As already noted, I believe it error to analyze this case as
if the police were under an obligation to act within one of
the narrow exceptions to the warrant requirement, yet this is
precisely what Ybarra would have us do. Whereas in *Terry*
the warrant requirement was inapposite, here the warrant re-
quirement has been fully satisfied. In either case we should
give full scope to the reasonableness requirement of the first
clause of the Fourth Amendment. Thus, in judging the rea-
sonableness of a search pursuant to a warrant, which search
extends to persons present on the named premises, this Court
should consider the scope of the intrusion as well as its
justification.

Viewed sequentially, the actions of the police in this case
satisfy the scope/justification test of reasonableness established
by the first clause of the Fourth Amendment as interpreted
in *Terry.* The police entered the Aurora Tap pursuant to
the warrant and found themselves confronting a dozen people,
all standing or sitting at the bar, the suspected location of
the contraband. Because the police were aware that heroin
was being offered for sale in the tavern, it was quite reason-
able to assume that any one or more of the persons at the
bar could have been involved in drug trafficking. This as-
sumption, by itself, might not have justified a full-scale search
of all the individuals in the tavern. Nevertheless, the police
also were quite conscious of the possibility that one or more
of the patrons could be armed in preparation for just such an
intrusion. In the narcotics business, "firearms are as much
'tools of the trade' as are most commonly recognized articles
of narcotics paraphernalia." *United States* v. *Oates,* 560 F.
2d 45, 62 (CA2 1977). The potential danger to the police
executing the warrant and to innocent individuals in this
dimly lit tavern cannot be minimized. By conducting an
immediate frisk of those persons at the bar, the police elimi-

nated this danger and "froze" the area in preparation for the search of the premises.

Ybarra contends that *Terry* requires an "individualized" suspicion that a particular person is armed and dangerous. While this factor may be important in the case of an on-the-street stop, where the officer must articulate some reason for singling the person out of the general population, there are at least two reasons why it has less significance in the present situation, where execution of a valid warrant had thrust the police into a confrontation with a small, but potentially dangerous, group of people. First, in place of the requirement of "individualized suspicion" as a guard against arbitrary exercise of authority, we have here the determination of a neutral and detached magistrate that a search was necessary. As this Court noted in *Fisher* v. *United States,* 425 U. S. 391, 400 (1976), the Framers of the Fourth Amendment "struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue." The question then becomes whether, given the initial decision to intrude, the scope of the intrusion is reasonable.

In addition, the task performed by the officers executing a search warrant is inherently more perilous than is a momentary encounter on the street. The danger is greater "not only because the suspect and officer will be in close proximity for a longer period of time, but also . . . because the officer's investigative responsibilities under the warrant require him to direct his attention to the premises rather than the person." W. LaFave, Search and Seizure § 4.9, pp. 150–151 (1978). To hold a police officer in such a situation to the same standard of "individualized suspicion" as might be required in the case of an on-the-street stop would defeat the purpose of gauging reasonableness in terms of all the circumstances surrounding an encounter.

*Terry* suggests an additional factor that courts must consider when confronting an allegedly illegal frisk for weapons. As this Court admitted in that case, "[t]he exclusionary rule has its limitations . . . as a tool of judicial control." 392 U. S., at 13. Premised as that rule is on the hypothesis that police will avoid illegal searches if threatened with exclusion of the fruits of such searches, "it is powerless to deter invasions of constitutionally guaranteed rights where the police either have no interest in prosecuting or are willing to forgo successful prosecution in the interest of serving some other goal." *Id.,* at 14. Where, as here, a preliminary frisk is based on an officer's well-honed sense of self-preservation, I have little doubt that "the [exclusionary] rule is ineffective as a deterrent." *Id.,* at 13.

Measured against the purpose for the initial search is the scope of that search. I do not doubt that a patdown for weapons is a substantial intrusion into one's privacy. See *Terry* v. *Ohio,* 392 U. S., at 17, n. 13. Nevertheless, such an intrusion was more than justified, under the circumstances here, by the potential threat to the lives of the searching officers and innocent bystanders. In the rubric of *Terry* itself, a "man of reasonable caution" would have been warranted in the belief that it was appropriate to frisk the 12 or so persons in the vicinity of the bar for weapons. See *id.,* at 21–22. Thus, the initial frisk of Ybarra was legitimate.

During this initial patdown, Officer Johnson felt something suspicious: a cigarette package with objects in it. The record below is not entirely clear as to the shape or texture of the objects, but it is clear that Officer Johnson had at least a subjective suspicion that the objects were packets of heroin like those described in the warrant. He testified, for example, that after patting down the other persons at the bar, he returned directly to Ybarra to search him "for controlled substances." App. 49. At this point, he reached into Ybarra's pants pocket, removed the cigarette package, and confirmed his suspicion.

While the test of reasonableness under the Fourth Amendment is necessarily objective as opposed to subjective, see *Terry* v. *Ohio, supra,* at 21–22, Officer Johnson's subjective suspicions help fill out his cryptic description of the "objects" that he felt in Ybarra's pocket. The objects clearly did not feel like cigarettes.[4] In this case we need not decide whether, as a general rule, an officer conducting an on-the-street frisk under *Terry* can carry his search into the pockets of a suspect to examine material that he suspects to be contraband. We are dealing here with a case where the police had obtained a warrant to search for precisely the item that Officer Johnson suspected was present in Ybarra's pocket. Whether Officer Johnson's level of certainty could be labeled "probable cause," "reasonable suspicion," or some indeterminate, intermediate level of cognition, the limited pursuit of his suspicions by extracting the item from Ybarra's pocket was reasonable. The justification for the intrusion was linked closely to the terms of the search warrant; the intrusion itself was carefully tailored to conform to its justification.

The courts below reached a similar conclusion. The trial court noted correctly that "[i]t might well not be reasonable to search 350 people on the first floor of Marshall Field, but we're talking about, by description, a rather small tavern." See App. 43. The question, as understood by the trial court, was the "reasonableness" of the intrusion under all the surrounding circumstances. *Ibid.* The Illinois Appellate Court agreed. In an earlier case, *People* v. *Pugh,* 69 Ill. App. 2d 312, 217 N. E. 2d 557 (1966), the Appellate Court had concluded that the police acted reasonably in searching the brother of the owner of the named premises during the exe-

---

[4] In fact, Officer Johnson did testify that the objects felt exactly like what they were: heroin. See App. 9 ("I felt some objects that I felt to be heroin"). See also *id.,* at 50 ("I felt objects in his pocket which I believed—"). In both cases defense counsel interposed objections to Officer Johnson's characterization of the objects, which objections the trial court sustained.

cution of a search warrant for narcotics. According to the Appellate Court in that case, "[t]he United States Constitution prohibits unreasonable searches . . . ; the search of Raymond Pugh under the circumstances of this case cannot be so classified." *Id.*, at 316, 217 N. E. 2d, at 559. In this case, the Appellate Court relied expressly on the holding and reasoning in *Pugh* and found no constitutional violation in the searches of Ybarra. These findings should not be overturned lightly.

I would conclude that Officer Johnson, acting under the authority of a valid search warrant, did not exceed the reasonable scope of that warrant in locating and retrieving the heroin secreted in Ybarra's pocket. This is not a case where Ybarra's Fourth Amendment rights were at the mercy of overly zealous officers "engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 13–14 (1948). On the contrary, the need for a search was determined, as contemplated by the second clause of the Fourth Amendment, by a neutral and detached magistrate, and the officers performed their duties pursuant to their warrant in an appropriate fashion. The Fourth Amendment requires nothing more.