453 So.2d 425 (1984)
Leron Herbert REDFIN, Appellant,
v.
STATE of Florida, Appellee.
No. 83-1340.
District Court of Appeal of Florida, Fifth District.
June 21, 1984.
Rehearing Denied July 30, 1984.
*426 Joseph Morrell, Winter Park, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and W. Brian Bayly, Asst. Atty. Gen., Daytona Beach, for appellee.
COBB, Judge.
The defendant, Redfin, pleaded nolo contendere to second-degree grand theft, reserving his right to appeal the order denying his motion to suppress. The issue raised in this case, which is dispositive, is whether Redfin was illegally searched. Given the evidence adduced at the suppression hearing below, the answer is yes. That evidence showed the following facts:
Redfin was recognized by a security guard named Holley at the Winter Park Mall as a man she had previously chased on suspicion of shoplifting in the mall. She notified Detective Collins of the Winter Park Police Department, who happened to be in the mall at the time. Holley subsequently pointed out the suspect, who was coming out of "The Phone Store," and Collins approached Redfin, showing him his badge and asking to speak to him. Collins asked Redfin if he had a gun, to which Redfin replied, "No."
Collins said Redfin was a suspect in another case he was working on, and when he came up to Redfin he "felt funny." He said he recognized Redfin's face, but didn't know who it was and the "way he walked did not seem right." He did not suspect that Redfin had taken anything from "The Phone Store." Collins patted Redfin down, beginning with the back of his pants. The following colloquy occurred, during Collins' testimony at the hearing:
Q Did you search because you didn't believe him or 
A I just pat everyone down when I think something is wrong like that.
Q Okay.
A Patted down his pants and coat, and felt something real hard on the outside of the coat.
Q Did you know what that object was at that time?
A No, I did not.
Q Did you investigate further to find out what the object was?
A Yes, I did.
Q What did it turn out to be?
A It's a square piece of a, I don't know what they call the base set of it. You have to plug the phone into it.
Q Okay. When you saw that, immediately, what do you think had taken place? Did anything cross your mind?
A It was a phone shop. I thought he had taken it from the shop.
Q Did you think he had purchased it?
A No.
Q Did you make up in your mind at that time that you were going to arrest Mr. Redfin?
A Yes, I did.
Q Okay, and that would be for the offense of theft from that phone shop?
A Yes.
Collins further testified:
Q At that time, you detained Mr. Redfin and you indicated that his arm was stiff. What exactly did you do?
A Okay. When I started patting him down, I felt something outside. He was wearing a, I don't know what you call, a corduroy  it's a brown jacket. I opened the inside of the coat to see what was inside the coat.
Q Did you believe he had a firearm concealed?
A I did not believe it.
Q Okay. After you patted him down, what else did you do?
A I took the phone out when I saw it.
Q Okay. I mean, but how did you see the phone? Did he open his coat?
A I opened the coat.
Q What did you see as soon as you opened the coat?

*427 A It was a large grey  large beige piece of machinery. I couldn't tell exactly what it was.
Q It didn't look like a gun?
A It did not.
* * * * * *
BY MR. LEWIS (Assistant State Attorney):
Q Detective, when you first searched the man, did you have any reason to believe at all that he might be carrying some weapon?
A No, not personally, no.
Q Okay. But it was your understanding that, based on the tip that you got from the security officer, that he committed at least one crime?
A One theft before, yes, sir.
Q Okay. Is it common practice among yourself and other police officers that when you make an arrest of an individual, or stop and detain an individual if he looks suspicious, as this gentleman did, that you would search him for weapons?
A Okay. I always have on anyone I stopped on any cases.
Q Okay.
Upon questioning by the court, Collins said that his intent was to have Redfin identified for the other shoplifting case so as to be able to file for a warrant. The following colloquy occurred between the court and Detective Collins:
THE COURT: Were you going to arrest him for the other case?
THE WITNESS: No, the other case was under a hundred dollars. The only thing I could do is get him identified by Holley and file for a warrant.
THE COURT: And so why did you pat him down?
THE WITNESS: Things didn't seem right, the way he walked and came up to us. And I just patted him down to make sure he didn't have any weapon.
THE COURT: So, you had a reasonable belief that he might have had or could have had?
THE WITNESS: Any time I stop anyone, I pat them down. I'm in investigations 
THE COURT: But why did you do that?
THE WITNESS: Just for my own safety. I found quite a few concealed weapons just doing that.
THE COURT: So, you do it then for the purpose of determining whether or not they have a weapon?
THE WITNESS: Yes, sir.
We find that Collins' stop of Redfin was proper. See State v. Webb, 398 So.2d 820 (Fla. 1981). However, a valid stop does not necessarily justify a frisk. Webb at 822. Florida's stop and frisk law, section 901.151, Florida Statutes (1981), requires probable cause to believe the detained person "is armed with a dangerous weapon" to justify a search.[1]See also Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That test clearly was not met under the facts presented by the above testimony. Collins did not suspect that Redfin had a weapon; the search here was prompted not by probable cause but rather by the routine Collins employed for all detainees.
REVERSED.
DAUKSCH and COWART, JJ., concur.
NOTES
[1] Section 901.151(5), Florida Statutes (1981), states:

Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) has probable cause to believe that any person whom he has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, he may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized.