OPINION OF THE COURT
Ellen M. Yacknin, J.
Defendant Demond Davis is charged with criminal possession of marijuana in the fourth degree, a misdemeanor under Penal Law § 221.15, arising from a police “buy and bust” opera *859 tion that occurred in the City of Rochester, New York, on December 5, 2002. Defendant moves to suppress the evidence obtained as a result of his allegedly illegal arrest and the allegedly illegal searches of the apartment at 69 Ontario Street that resulted from the “buy and bust” operation. The People oppose defendant’s motion, asserting that the arrest and searches were lawful. The People also maintain that even if the searches were unlawful, defendant has no legal standing to ask this court to suppress the evidence obtained as a result of the searches.
A probable cause hearing was conducted by the court on February 3, 2003 and February 21, 2003. Three police officers involved in defendant’s arrest and the search of the apartment testified for the People. Defendant testified on his own behalf. Based on the credible evidence elicited at the hearing, and on an analysis of applicable legal principles, the court makes the following findings of fact and conclusions of law.
Findings of Fact
On December 5, 2002, at approximately 2:20 p.m., experienced members of the Rochester Police Department and the New York State Police jointly conducted a “buy and bust” undercover operation on Ontario Street in Rochester, New York. Simply stated, the “buy and bust” operation involved the purchase of illegal drugs by an undercover officer who was being watched, supported and audibly monitored by other undercover and uniformed police officers.
Rochester Police Sergeant William Peck, who was in charge of the operation, was stationed with another officer in an unmarked police car on the corner of Scio Street and Lewis Street. From his surveillance car’s vantage point, Sergeant Peck could see several houses on Ontario Street by looking diagonally across the Lewis Street Center playground located between Lewis Street and Ontario Street. As he watched with binoculars, Sergeant Peck witnessed a drug transaction take place in front of a house just east of 69 Ontario Street between an undercover police officer and a man later identified as Richard Goodman (Goodman). The undercover officer was wired with a Kel monitor that enabled the other members of the operations team, including Sergeant Peck, to monitor his conversation.
As Sergeant Peck watched, the officer got out of the unmarked car he was driving and approached Goodman to ask about purchasing marijuana. After the two men discussed the transaction, Sergeant Peck saw Goodman walk with his bicycle *860 to the east side of 69 Ontario Street, saw Goodman park his bicycle, and saw Goodman continue on foot towards the rear of the building.
A few minutes later, Sergeant Peck saw Goodman return to the sidewalk and give the undercover officer three dime bags of marijuana in exchange for $30 cash.[1] Goodman then got onto his bicycle, and rode four or five houses westbound on Ontario. Sergeant Peck then told Sergeant Edward McDonald, who was in the arrest vehicle, that a deal had been made, and directed McDonald to Goodman’s location. After arriving at the location, Sergeant McDonald and other officers arrested Goodman.
During a search incident to Goodman’s arrest, a key was found on Goodman. Goodman told Sergeant Peck that the key was to his house at 41 Ontario Street. Sergeant Peck took the key and, with Sergeant McDonald and New York State Trooper LaLonde, walked up to the rear door on the east side of 69 Ontario Street. Sergeant Peck put the key into the door’s lock. The key worked, but before he opened the door, Sergeant Peck knocked and announced the presence of police. After hearing no response, he opened the door, knocked and announced the presence of police a second time.
At this point, Sergeant Peck and Sergeant McDonald heard footsteps upstairs on the second floor, like the sound of people running. Through their radios, they then heard other police officers reporting that there were three people coming out of the front door of 69 Ontario Street.
Upon opening the building’s rear door, Sergeant Peck did not see any interior doors on the first floor. However, he did see a staircase leading up to the second floor. Sergeant Peck, Sergeant McDonald, and New York State Trooper LaLonde proceeded up the stairs that led them directly to an open door into the upstairs apartment.
*861 From the kitchen, the three officers walked through an open doorway to the middle room intended to be the dining room, and then through an open doorway to the living room. In the living room, there was a table surrounded by three chairs. Loose marijuana, 79 small Ziploc baggies containing marijuana, and $198 in cash were on the table, and a coat was on each chair. When he saw the marijuana on the table, Sergeant McDonald radioed to the officers in front of the apartment building, and directed them to detain the people who had left the front of the building.
The officers walked through the rest of the apartment, but found no other marijuana or cash. The officers found no people in the apartment, nor did they see any guns or other weapons.
After finishing their walk-through, Sergeant Peck, Sergeant McDonald and Trooper LaLonde left the apartment through the front door, which was open, and went down the front staircase. At the bottom of the stairs, in the hallway, was a shut door to the downstairs apartment. The officers left the building through the front door, which was open.
When they exited the building, Sergeant Peck and Sergeant McDonald approached the police officers who had apprehended three men, including defendant, as they came out of the building. Sergeant Peck noticed that none of the three men had coats on. At that point, Sergeant Peck, Sergeant McDonald, and other officers brought the three detained men back upstairs into the second floor apartment. Sergeant McDonald and other officers remained with the detained men. Sergeant McDonald patted defendant down, but found no weapons or marijuana.
Sergeant Peck then decided to obtain a search warrant. Sergeant Peck radioed the information to Police Officer Frank Alvarado, and directed him to draft an affidavit and obtain the search warrant. Officer Alvarado had been in an unmarked police car near the scene of the drug transaction, but he had not been able to see the transaction from his position; he had only heard what was going on through the Kels and the radio, he had not observed the transaction from his position.
Officer Alvarado drove to the Public Safety Building in downtown Rochester, where he began typing an affidavit and search warrant based on the information Sergeant Peck had given him over the radio. While preparing the documents, Officer Alvarado called Sergeant Peck on his cell phone to obtain additional information. When he was finished, Officer Alvarado brought the documents to a Monroe County Court judge, who signed the warrant.
*862 At 4:25 p.m., Officer Alvarado returned to 69 Ontario Street with the warrant to conduct a complete search of the apartment. During the search, officers found, among other items, a camouflage jacket with documents containing Andre Scott’s name, two cell phones, and a satellite dish card.
Conclusions of Law
Defendant’s Standing to Challenge the Searches
Initially, the court must determine whether defendant has standing to challenge the searches of the apartment where the marijuana and cash were found. Generally, to have standing to challenge a police search, a defendant has the burden of demonstrating that he or she has a “legitimate expectation of privacy in the searched premises.” (People v Wesley, 73 NY2d 351, 358-359 [1989]; see People v Ramirez-Portoreal, 88 NY2d 99, 108 [1996].) Defendant must meet this burden even where the crime charged is a possessory offense that is based on a theory of constructive possession, as opposed to actual possession. (See People v Wesley, 73 NY2d at 359-360, 363; People v Ponder, 54 NY2d 160, 166 [1981].)
Nevertheless, under limited circumstances, a defendant has automatic standing to challenge an allegedly unlawful search regardless of whether he or she has an expectation of privacy in the premises searched. Specifically, a defendant has automatic standing to challenge a search where the defendant is charged with a possessory offense that is based on a statutory presumption that attributes possession to a defendant. (See People v Rodriguez, 303 AD2d 783 [3d Dept 2003]; People v Tejada, 81 NY2d 861, 863 [1993]; People v Millan, 69 NY2d 514 [1987].) One such presumption that will bestow automatic standing on a defendant is the room presumption under Penal Law § 220.25. (See People v Rodriguez, 303 AD2d 783 [2003]; People v Hooks, 258 AD2d 954 [4th Dept 1999], lv denied 93 NY2d 972 [1999].)
In this action, defendant does not attempt to claim a legitimate expectation of privacy in the apartment that was searched. To the contrary, defendant testified that a friend whom he bumped into invited him to the apartment to play video games with another friend, and that he did not know who actually lived in the apartment. He asserts, instead, that because the only possible theory of guilt that the People can put forward compels the use of the room presumption under Penal Law § 220.25, he has automatic standing to challenge the apartment searches.
The People do not dispute their intent to prove defendant’s guilt by way of the room presumption provided under Penal *863 Law § 220.25. They assert, however, that they also intend to prove defendant’s guilt by way of a showing of constructive possession. Because they do not intend to rely “solely” on the statutory presumption to prove possession, the People contend that defendant is not entitled to automatic standing. (See People v Hooks, 258 AD2d 954; People v Paulino, 216 AD2d 238 [1st Dept 1995], lv denied 87 NY2d 849 [1995].)
The flaw with the People’s position is that despite their purported intent, the record is devoid of any evidence supporting a constructive possession theory of defendant’s guilt. To prevail on a constructive possession theory, the People will be required to prove, beyond a reasonable doubt, that defendant exercised “ ‘dominion and control’ over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized.” (People v Manini, 79. NY2d 561, 562 [1992]; see People v Headley, 74 NY2d 858 [1989]; People v Rivera, 176 AD2d 498 [1st Dept 1991]; People v Dawkins, 136 AD2d 726 [2d Dept 1988].)
Viewed in the light most favorable to the People, the admissible evidence in the record fails to suggest — let alone prove— that defendant exercised dominion and control over either the apartment or Goodman, who was the only one found with marijuana. He was not found or observed in the room where the marijuana was, and no marijuana was found on or near him. He was not found or observed with Goodman, who had the key to the apartment, and there is no evidence that defendant even knew Goodman. On the contrary, defendant testified that he had never been in the apartment before, and that he knew neither Goodman nor the person who rented the apartment.
Given the dearth of evidence of defendant’s dominion and control over the apartment, there is no showing of any basis for the People’s assertion that they intend to prove defendant’s guilt under a constructive possession theory. Under these circumstances:
“[L]ogic and equity dictate that, before a defendant can be deprived of automatic standing under the room presumption, the People must demonstrate that there is some basis for their alternative allegation of dominion and control. If they fail to make such a showing at the hearing, their bare-bones assertion that they intend to do so at trial will not be enough to deny the defendant standing to challenge the search.” (People v Rivera, NYLJ, Oct. 3, 1996, *864 at 24, col 6 [Sup Ct, NY County 1996]; see People v Rodriguez, 303 AD2d 783, 784 [2003] [automatic standing found where grand jury minutes revealed no evidence of defendant’s actual or constructive possession of drugs].)[2]
Accordingly, I find that defendant has automatic standing to challenge the searches of the apartment where the marijuana was discovered.
The Warrantless Search
Under certain circumstances, police are entitled to effect a warrantless entry into a residence to search for evidence because there is no time to obtain a warrant. Among the circumstances justifying such a “protective sweep” are the likely destruction of evidence (see Matter of Kwok T., 43 NY2d 213, 220-221 [1977]; People v Lee, 83 AD2d 311, 314 [1st Dept 1981], affd 58 NY2d 771 [1982], cert denied 460 US 1044 [1983]), or the imminent danger to police officers posed by the use of weapons (see People v Bost, 264 AD2d 425, 426 [2d Dept 1999]; People v Martinez, 187 AD2d 992, 953 [4th Dept 1992], lv denied 81 NY2d 889 [1993]).
With regard to the possible destruction of evidence, the police must possess a reasonable belief that evidence may be lost or destroyed. (See Matter of Kwok T., 43 NY2d at 220-221.) The standard for determining whether imminent danger exists is whether the police possess “articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing danger to those on the arrest scene.” (People v Bost, 264 AD2d at 426 [internal quotation marks omitted], quoting Maryland v Buie, 494 US 325, 334 [1990]; see People v Martinez, 187 AD2d at 953.) In either situation, the People’s burden of demonstrating the existence of the exigent circumstances necessary to justify the warrantless search is heavy. (See People v Cruz, 149 AD2d 151, 159 [1st Dept 1989].)
At the preliminary hearing, Sergeant Peck testified that based on his extensive experience in narcotics investigations, he was aware that weapons are often associated with drug transactions, and that drugs are often destroyed. He stated that because of his concerns about officer safety and the pos *865 sible destruction of evidence, he and the other police officers entered the apartment with the key they had seized from Goodman. Sergeant Peck’s testimony notwithstanding, I find that the People have failed to meet their heavy burden of demonstrating that either these, or any other, purported exigent circumstances existed to justify a warrantless search of the apartment at 69 Ontario Street.
The record reveals that both the drug sale and Goodman’s arrest occurred on the sidewalk on Ontario Street, several yards away from the apartment building at 69 Ontario Street. An arrest of a person on the street, in and of itself, does not justify a warrantless search of a residence. (See Vale v Louisiana, 399 US 30, 35 [1970].)
After Goodman’s arrest, Sergeant Peck took the key found in Goodman’s pocket and proceeded to 69 Ontario Street to use the key to open the rear door to the apartment building. The record contains no evidence to suggest that Goodman, or any other source, gave Sergeant Peck, or any other police officer, any reason to suspect or guess that the premises were occupied by others who could destroy evidence. The record contains no evidence to suggest that Goodman, or any other source, gave Sergeant Peck, or any other police officer, any reason to suspect that there was anyone in the premises who had weapons or who could spark violence. There is nothing in the record to suggest that Sergeant Peck, Sergeant McDonald, or any other police officer saw anyone in the building at all, let alone anyone wielding guns or other weapons. In fact, both Sergeant Peck and Sergeant McDonald conceded that they never heard anyone calling for help, and that they nevei heard any gunshots. Further, the mere fact that Sergeant Peck might have suspected that drugs were located within 69 Ontario Street was insufficient to justify the warrantless entry. (See People v Lee, 83 AD2d at 314.)
In short, there is no evidence in the record to suggest that any evidence might be destroyed, or that the safety of police officers would be compromised, if a search warrant were obtained before the search was conducted. It was not until Sergeant Peck actually effected the warrantless entry of 69 Ontario Street that he had any cause to believe that there might have been people in the apartment. Clearly, therefore, “the police had ample opportunity to obtain a search warrant after arresting and placing [Goodman] in custody.” (Matter of Kwok T., 43 NY2d at 221; see Vale v Louisiana, 399 US at 35.) Accordingly, there was no reasonable or valid basis, let alone any exigent *866 circumstances, to justify entering the apartment without a search warrant.
The Search Incident to a Search Warrant
Having found the police officers’ warrantless search to be unlawful, the court must determine separately whether the evidence obtained from the search incident to the search warrant must be suppressed. As the Court of Appeals has observed, “if the evidence was revealed as a direct consequence of the unlawful police action, the evidence is tainted and must be suppressed.” (People v Boodle, 47 NY2d 398, 402 [1979].)
Here, the police officers discovered the marijuana and cash on the table after illegally entering the apartment, and before the police officers had even applied for a search warrant. In fact, to justify the request for a search warrant, Police Officer Alvarado’s affidavit described in detail the warrantless entry and search of the apartment, as well as the items viewed during the unlawful search. Essentially, the search warrant was “based upon evidence obtained from [an] unlawful search” (People v Cirrincione, 207 AD2d 1031, 1032 [4th Dept 1994]), and “the Judge who issued the warrant was not given the information that would have shown that tainted information provided the basis of the [warrant] application.” (People v Baez, 173 Misc 2d 380, 388 [Sup Ct, Bronx County 1997].)
Accordingly, the evidence seized as a result of the search warrant, which was based on information obtained as a result of the unlawful search of the apartment, must be suppressed. (See People v Cirrincione, 207 AD2d at 1032; People v Jimenez, NYLJ, Mar. 30, 1998, at 29, col 2 [Sup Ct, NY County 1998].)
Defendant’s Arrest
Whether defendant’s arrest after he left the apartment was lawful depends upon whether the police officers had probable cause to believe he had committed a crime. (See People v Wroblewski, 109 AD2d 39, 42-43 [4th Dept 1985], affd 67 NY2d 933 [1986], cert denied 479 US 845 [1986].) Further, a warrantless arrest demands a higher quantum of evidence of probable cause to justify the arrest than an arrest pursuant to a warrant. (See People v Bigelow, 66 NY2d 417, 424 [1985].) Under the circumstances of this case, I find that there was not probable cause to make a warrantless arrest of defendant.
“It is well settled that neither mere presence of an individual at a scene of criminal activity nor an individual’s flight, without any other indicia of criminal activity, establishes probable cause.” (People v Sanchez, 276 AD2d 723, 724 [2d Dept 2000], *867 lv denied 96 NY2d 787 [2001]; see People v Jones, 234 AD2d 1002 [4th Dept 1996], lv denied 89 NY2d 1095 [1997]; see Ybarra v Illinois, 444 US 85, 91 [1979]; People v Howard, 50 NY2d 583 [1980], cert denied 449 US 1023 [1980].) The only possible indicia of probable cause in this action were defendant’s arrival at the crime scene after the crime had occurred, and defendant’s ostensible flight from the police. Because these factors, without more, do not provide sufficient probable cause to justify an arrest, defendant’s arrest was illegal.
Defendant and his two companions were stopped and held in custody as they left the premises at 69 Ontario Street. The police officers had no basis at that time to believe that defendant had committed a crime. There was no evidence that the apartment building at 69 Ontario Street was a known drug house or the site of other illegal activity. No one observed Goodman coming out of 69 Ontario Street. Although Goodman had been seen walking up the drive next to 69 Ontario Street, there was no evidence that he had any connection at all with defendant, or that defendant had any connection with him. The fact that Goodman had made a sale of marijuana on the sidewalk a few houses down from 69 Ontario Street does not establish probable cause for defendant’s arrest. (See Ybarra v Illinois, 444 US at 91; People v Sanchez, 276 AD2d at 724.)
Similarly, the fact that defendant and his companions did not have their coats on when they came out of 69 Ontario Street, and that one of defendant’s companions was barefooted, does not establish probable cause for an arrest. They did not leave the house until after the police entered and announced their presence, and went, uninvited, upstairs. While those facts might suggest that defendant was fleeing from the police, flight from police does not establish probable cause for a warrantless arrest. (See Ybarra v Illinois, 444 US at 91; People v Sanchez, 276 AD2d at 724.)
Further, but for the illegal entry of the apartment, the police would not have known that defendant was there, defendant would not have left the apartment under circumstances suggesting flight, and all possible clues of probable cause would have been nonexistent. Under these circumstances, defendant’s arrest cannot withstand scrutiny. (See, e.g., People v Sanchez, 276 AD2d at 724 [defendant’s presence near the vicinity of a gunshot and his subsequent flight did not establish probable cause for his arrest].)
*868 Conclusion
For the foregoing reasons, defendant’s motion to suppress the evidence obtained as a result of his arrest, the warrantless search of the apartment at 69 Ontario Street, and the search of the apartment pursuant to the search warrant is granted.

. At the suppression hearing, Sergeant Peck testified that he saw Goodman open and go into a rear door on the east side of 69 Ontario Street, and then saw Goodman come out of the door a few minutes later. However, in his investigative action report (admitted as defendant’s exhibit G), which he wrote the same day as the operation, Sergeant Peck did not mention that he saw Goodman open, go into, or come out of a rear door at 69 Ontario Street. Rather, the report states only that Sergeant Peck saw Goodman continue on foot towards the rear of the building, and return to the sidewalk a few minutes later. Likewise, Police Officer Alvarado’s affidavit in support of a search warrant, based on the information provided to him by Sergeant Peck, did not mention that Sergeant Peck had seen Goodman open, go into, or leave the door. Accordingly, I find Sergeant Peck’s testimony in this respect not credible.

. This preliminary determination applies to the standing issue only and does not prevent the People from attempting to prove constructive possession during trial. (See People v Rivera, NYLJ, Oct. 3, 1996, at 24, col 6 [Sup Ct, NY County 1996].)