526 So.2d 1177 (1988)
STATE of Louisiana
v.
Frederick Alden CABLER.
No. K87-368.
Court of Appeal of Louisiana, Third Circuit.
April 6, 1988.
*1178 Julie E. Cullen, New Orleans, for defendant-appellant.
J. Phil Haney, Asst. Dist. Atty., St. Martinville, for plaintiff-appellee.
Before DOMENGEAUX, STOKER and YELVERTON, JJ.
STOKER, Judge.
On October 3, 1986 defendant was charged by bill of information with possession of illegal drugs in violation of LSA-R. S. 40:966(C) and LSA-R.S. 40:969(C). On February 2, 1987 defendant's motion to suppress evidence was granted as to the marijuana recovered from defendant's motorcycle, but denied as to evidence recovered from defendant's person. Defendant applied to the Court of Appeal, Third Circuit for a supervisory writ as to the denial of the motion to suppress the evidence found on defendant's person, which was denied. Defendant then applied for a supervisory writ from the Supreme Court. That court granted the writ and remanded the case to the Court of Appeal, Third Circuit for briefing, argument and an opinion. 514 So.2d 450.

ASSIGNMENT OF ERROR
This case presents a single assignment of error. Defendant contends the trial court erred in the following respect:
The trial court erred in denying the motion to suppress evidence filed in this matter in that the detention and search of the defendant was in violation of his constitutional right to be free from warrantless searches and seizures or, in the alternative, that there were insufficient, exigent circumstances to justify the warrantless detention and search of defendant.

*1179 FACTS
Deputy Dupuis and Officer Pelican were working during the Breaux Bridge Crawfish Festival on the evening of May 3, 1986. Dupuis heard a radio broadcast from another officer concerning a fight. Dupuis proceeded to the area of the fight and was shown an individual who was bleeding. This man said he was from Metairie and had "been jumped by the bridge" and received injuries to his forehead and the back of his head, possibly from a brass knuckle or pipe. The man could not identify his attackers and merely described them as three "biker-type fellows," two with ponytails and one with long straight hair. This man told Dupuis that his attackers went off toward some motorcycles and then pointed toward the vicinity in which defendant and ten to fifteen other individuals were standing. However, the officers did not ascertain how much time had elapsed since the attack took place or the Metairie man's name. The man then left and was never identified or interviewed again. Dupuis alone testified concerning the victim's statement and actions. It is not clear whether or not Officer Pelican heard the conversation between the victim and Dupuis.
Deputy Dupuis gave the following testimony as recorded on pages 6, 7, 14 and 15 of the transcript of the suppression hearing:
"Q Did you talk with any individuals once you arrived at the scene?
A I was pointed out to an individual who was bleeding from forehead. I went talk to him. He was from Metairie, Louisiana. He had received injuries to the forehead and back of his head from a metal object, either a brass knuckle or a pipe which three or four fellows had jumped him right by the bridge.
Q And did you receive information from him as to the whereabouts of those individuals?
A He couldn't identify the individuals who had jumped him. The only thing he said that the persons that had attacked him had ran to a group of people which the task force had already secured and said that two of the fellows that had attacked him had ponytails and one of them had long, straight hair.
Q Did you see any individuals in the immediate area that resembled that description?
A There were several.
Q And did you issue any instructions once you had received this information?
A I instructed the officers who had several of the individuals secured to put them against the wall and pat down for weapons to try to locate the brass knuckles or the object used to strike the victim.
Q What time of day or night was this, sir?
A That was some time around 9:30 p.m. that night on the third.
Q Did you see the defendant amongst that group?
A Yes, Mr. Cabler. He cut his hair but that's him right there.
BY MR. HANEY:
Let the record reflect, Your Honor, he pointed to the defendant.
BY THE COURT:
Let it reflect.
BY MR. HANEY:
Q Was he amongst this group of people that were pointed to by this individual?
A He was in the group, the area that the victim had pointed out. Yes, sir.
Q All right. After you instructed the other officers to place them up against the wall, did you see what took place?
A Yes, several officers took their position to where they could secure the people and the balance of the officers patted down for weapons.
* * * * * *
Q Now, you said the subjects had been secured by the time you got to the scene. How many subjects are we talking about?
A You're looking about at twelve or thirteen of them that was there. They had three
*1180 Q Excuse me. I didn't mean to interrupt.
A They had several males and I think three or four females.
Q And this was a search in or following a reported fight?
A Correct.
Q The witness that was bleeding, the unnamed man from Metairie, what did he say had happened?
A That he was jumped. He was crossing the bridge, going across the bridge that he got in a confrontation with three individuals and he got jumped and one of them hit him either with a brass knuckle or a blackjack.
Q He said either brass knuckles or a blackjack?
A Correct.
Q Other than long hair, ponytails or long hair, did he identify the clothing that the people had on?
A No, he identified the long hair and the ponytail but said a biker type. He said they went towards the bikes.
Q How many "biker types" were there at the Crawfish Festival?
A Just in that area where their bikes were, the bikes were in that area where they were at, there must have been at least twenty-five.
Q And other than three long haired biker types who went in that area, you had no more specific information from the man who was the victim of this alleged injury, is that correct?
A Correct.
Q Now, how long did you talk to the man from Metairie?
A No more than a minute or two."
Officer Pelican gave the following testimony as recorded on page 43 of the transcript of suppression hearing:
"Q Had you seen Mr. Cabler or any of the people that you eventually saw that night causing any kind of trouble during the day?
A Not that I recall.
Q Now, when you got to that location, did Officer DupuisHe was already there?
A Yes, Ma'am.
Q When you got there. What did you observe when you first got to the location?
A Officer Dupuis was talking to a subject and that's when he made the statement, "Put everybody that was in the group along the wall and pat down for weapons. We don't know what we got."
Q We don't know what we've got. Okay. Were you a party to the conversation that Officer Dupuis had with this subject?
A No, Ma'am.
Q Did you ever get a name of this subject?
A No, Ma'am.
Q You just basically followed Officer Dupuis' directions?
A Right.
Q How many of the individuals did you yourself pat down or search?
A One only.
Q Just Mr. Cabler?
A Yes, Ma'am."
After acquiring the information from the unknown victim, Dupuis went to the vicinity pointed out by the victim and observed a large group of individuals, amongst whom were men with long hair. Dupuis instructed the other officers to "put them against the wall" and pat them all down, including the women. Pelican conducted the pat down search of defendant and felt a hard, round object in a pocket which he felt could have been a knife. The object was recovered and found to be a prescription bottle with lysergic acid diethylamide tablets inside. Defendant was arrested and mirandized. The defendant was then searched and a bottle of diazepam was found. Pelican stated that he maintained custody of defendant until he was brought to the sheriff's substation, that neither Dupuis nor any other officer talked to defendant, and that defendant did not give anyone permission to search his motorcycle. However, Dupuis testified that after defendant was arrested for possession of narcotics he gave officers consent to search his motorcycle which was located some distance *1181 from the scene of the frisk. Marijuana was found in the saddlebags on the motorcycle.
Pelican testified that defendant was very cooperative, offered no resistance of any kind and was not intoxicated. Both Pelican and Dupuis testified that they did not observe any blood on defendant's clothing or on any of the other members of the group searched. Neither officer had observed any fight or other disturbance. Pelican and other defense witnesses testified there were a large number of motorcycle riders at the festival.

APPLICABLE LAW
LSA-C.Cr.P. art. 215.1 provides:
"Art. 215.1. Temporary questioning of persons in public places; frisk and search for weapons
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."
The issue is whether the officers had reasonable cause to pat down defendant. In Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), officers conducted a pat-down search for weapons of the nine to thirteen customers present in a tavern which the officers were searching pursuant to a premises search warrant. Narcotics were found in a cigarette package in Ybarra's pants pocket. The court stated as to the legality of the weapons search of Ybarra:
"The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons.5 Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612; Terry v. Ohio, supra, 392 U.S., at 21-24, 27, 88 S.Ct., at 1879-1881, 1883. When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most Agent Johnson could point to was that Ybarra was wearing a 3/4-length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.
The Terry case created an exception to the requirement of probable cause, an exception whose `narrow scope' this Court `has been careful to maintain.'6 Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. See, e.g., Adams v. Williams, supra (at night, in high-crime district, lone police officer approached person believed by officer to possess gun and narcotics). Nothing in Terry can be understood to allow a generalized `cursory search for weapons' or *1182 indeed, any search whatever for anything but weapons. The `narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." (Emphasis added)
The court held the officers did not have reasonable cause to frisk Ybarra. The dissenting opinions in Ybarra point out that the officers in that case did have a search warrant.
Generally, a search conducted without a warrant is per se unconstitutional. State v. Tant, 287 So.2d 458 (La.1973). A law enforcement officer who reasonably suspects a person of committing a crime may stop that person to investigate his activities and frisk the person's outer clothing if he feels himself or others to be in danger or he reasonably suspects that the person possesses a dangerous weapon. LSA-C.Cr.P. art. 215.1; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Reasonable cause or suspicion, as required by LSA-C.Cr.P. art. 215.1 has been interpreted as something less than probable cause. Nevertheless, the officer must have articulable knowledge of particular facts which, in conjunction with reasonable inferences drawn therefrom, is sufficient to provide reasonable grounds to suspect the party involved of past, present or imminent criminal activity. State v. Bickham, 404 So.2d 929, 931 (La.1981); State v. Wilson, 366 So.2d 1328 (La.1978). In determining whether reasonable cause exists sufficient to justify the government's intrusion into an individual's freedom, the totality of the circumstances giving rise to the suspicion must be examined. State v. Belton, 441 So.2d 1195 (La.1983). If reasonable cause does not exist for an investigatory stop and frisk, evidence seized therefrom is illegal. Belton, supra. Knowledge that an offense has been committed is often a critical element in establishing reasonable cause. When the officer making the stop knows a crime has been committed, he has only to determine whether the additional trustworthy information justifies a man of ordinary caution to suspect the detained person of the offense. Bickham, supra.
We do not believe the officers in the case before us had a reasonable belief that defendant was carrying a weapon. Based on an extremely vague description given by an unknown victim, the officers walked in the direction in which the victim said his attackers went and stopped at the first group of people they saw which included long-haired "biker-type" persons. They then proceeded to frisk the entire group, including the women. The victim in this case did not file a complaint or identify his assailants, and the officers did not ascertain how much time had elapsed since the attack. The officers did not allege the defendant displayed suspicious or nervous conduct and admitted there were no blood stains on defendant. No evidence indicating that defendant was armed was introduced.
Moreover, these officers did not limit their pat down searches to males and did not search further for the assailants, although apparently none were found. The officers seem to have had some other motive for the search of this group but, unfortunately, no other justification has been provided.
After considering the totality of circumstances presented by the facts of this case, we conclude that reasonable cause did not exist for the investigatory stop and frisk of defendant's person. Accordingly, we find that the trial court erred in failing to grant defendant's motion to suppress the narcotics found on defendant's person.

DECREE
For the reasons assigned, the judgment of the trial court is reversed, and the motion to suppress is granted. The case is remanded for further proceedings not inconsistent with the views expressed herein.
REVERSED AND REMANDED.
DOMENGEAUX, J., dissents and assigns reasons.
*1183 DOMENGEAUX, Judge, dissenting.
The defendant has applied for review of the denial of his motion to suppress drugs found on his person pursuant to a frisk search conducted at the Breaux Bridge Crawfish Festival. The majority reverses the Trial Judge's ruling by finding that the police did not have reasonable cause to search the defendant for a weapon based on the following reasons: The search was conducted pursuant to "an extremely vague description given by an unknown victim", the police "stopped at the first group of people that they saw" which happened to be a group of "biker types", the officers failed to ascertain the amount of time that had elapsed since the attack and the police frisked women as well as men. The opinion ends by conjecturing that the police seemed to have other (apparently suspect) motives for searching the group. Because I feel that the majority has drawn erroneous legal conclusions from the uncontroverted facts and, has inferred additional facts that are inconsistent with the evidence, I respectfully dissent.
The facts of the case are uncontroverted and are as follows: At 9:30 p.m. on the last night of the Breaux Bridge Crawfish Festival, a police radio communication reported a gang fight behind the St. Bernard gym. Police patrolling one and one-half blocks away immediately responded to the call. Upon arriving at the reported fight scene, the police found a man bleeding profusely from his forehead who claimed to have been "jumped" by three or four men who were described as "biker types", two with ponytails and one with long straight hair. The victim gave his name, identified himself as a visitor from Metairie, Louisiana, and stated that he had been struck on his forehead and on the back of his head with a metal object such as brass knuckles or a pipe. Amidst all of the excitement the responding officer did not write down the victim's name. The victim, who appeared to have been drinking, was told to get medical attention from a nearby ambulance unit. Prior to leaving, the victim stated that the attackers had gone toward a group of motorcycles and he pointed in the direction of a group of individuals commonly described as "bikers" of which the defendant was one. The police approached the group and proceeded to search the entire group for weapons. A search of the defendant uncovered the drugs which were the subject of this motion to suppress.
Contrary to the majority's characterization, it is obvious under the facts that the attack had just occurred. The radio communication reported the occurrence of a fight at a specific location. This alone indicates that the fight was either ongoing or had just ended. Additionally, a profusely bleeding victim would also indicate that the attack had just recently occurred. Through a strained interpretation of the facts, the majority raises the issue that the attack may not have recently occurred, a fact that even the defendant does not argue because it is so self-evident from the uncontroverted facts.
Additionally, the majority has characterized the victim as an "unknown victim" that was unreliable because he did not stay to try and press any charges. The only thing unknown about the victim was his name. He gave his name and identified himself as a visitor from Metairie, Louisiana, and his forehead injuries substantiated his claim that he had just been attacked. The fact that the police failed to record the victim's name and, that subsequent to the search, the victim seemed to have disappeared did not impeach the victim's credibility and reliability in describing his assailants. One can readily assume that as an out of town visitor to the area that had just been attacked for unknown reasons and received subsequent medical attention, he undoubtedly wished to avoid any further inconvenience, so he did not later report back to the police. His slightly inebriated state combined with the fact that he had just been attacked in the dark adequately explained why he could not give a more detailed description of his assailants. Regardless of this, however, his description was far from "extremely vague" when considered in light of the totality of the circumstances. The assailants were described as three to four men, "biker types", two *1184 with a ponytail and one with long straight hair. The victim also indicated that the assailants had fled towards the direction of the defendant's group. Despite the majority's statement that the police "stopped at the first group of people they saw" which happened to be the defendant's group, the uncontroverted facts were that the victim pointed toward the defendant's group as the direction in which the assailants had fled and the police searched this group because the victim had pointed them out and because they matched the physical description of the assailants.
Additionally, the fact that the search included the women in the group is irrelevant to the issue of whether the plaintiff had reasonable cause to search this defendant for weapons. Finally, the majority's assertion that the police apparently had some other motive in searching the group is conjecture, contrary to the testimony of the police officers, and completely inconsistent with the obvious exigency the police were working under in trying to capture fleeing assailants.
In light of the totality of the circumstances, not only did the police have reasonable cause to search the defendant for weapons, the police could have been considered remiss in their duties had they chosen to not respond as they did, and hence allow a potentially volatile situation to develop which posed a danger to the public at large attending the festival.
For the foregoing reasons, I respectfully dissent, and would reaffirm our previous ruling which denied defendant's writ application. The evidence should not be suppressed.