Filed 9/6/13  P. v. Martin CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON MARTIN,<br><br>    Defendant and Appellant. | B242102<br><br>(Los Angeles County<br>Super. Ct. No.  BA386277 ) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Brandon Martin, appeals his conviction, by guilty plea, for possession of a controlled substance (Health & Saf. Code, § 11350). He was placed on deferred entry of judgment for 18 months.

The judgment is affirmed.

## BACKGROUND

The following facts are taken from the hearing on Martin's motion to suppress evidence.

1. *Prosecution evidence.*

Los Angeles Police Officer Victor Cadena, assigned to a narcotics enforcement detail on the afternoon of July 6, 2011, was in plain clothes and driving an unmarked police van. Near Monte Vista and 52nd Streets, while "monitoring the area for narcotics activity," Cadena saw two African-American men walking down the street. One of them "matched the description of a [grand theft auto] suspect that had been broadcast the day before" as being "a light-skinned male black with dreadlocks." Cadena testified this man drew his interest because "it was in the area where [the car theft had] happened. Also, he was exactly like they described, a light-skinned male black and had dreadlocks."

The man with the dreadlocks turned out to be Huteson and his companion was defendant Martin. Cadena radioed to have a backup unit respond to the scene and make a pedestrian stop. While awaiting the backup unit, Cadena continued to monitor the two men. He saw them walk down Monte Vista and turn onto Avenue 51. "About a couple houses west they met up with a male Hispanic who . . . handed witness Huteson an object. Huteson then handed that male Hispanic an object. Then they separated." When the backup officers arrived, Cadena instructed them to detain Huteson and Martin, who were handcuffed.

Cadena walked over and asked Huteson and Martin for their identifications. He also made a radio request to have Officer Ibarra, who had provided the description of the grand theft auto suspect, come to the scene to see if he could identify Huteson. While waiting for Ibarra to arrive, warrant checks were run on the two men. It turned out there was an outstanding misdemeanor arrest warrant for Martin.

Ibarra arrived within 15 minutes or less. He said Huteson "looked just like" the grand theft auto suspect, except the suspect did not have tattoos and Huteson "had tattoos on his arms and face. So [Ibarra] eliminated him as a suspect." Huteson was released. Martin was taken into custody on the outstanding arrest warrant. When Martin was later searched at the police station holding tank, he was found to be in possession of cocaine.

2. *Defense evidence.*

Martin testified he ran into his friend Huteson after getting off the bus and they were walking down Avenue 54 toward Martin's father's house on Avenue 51. When Huteson stopped to talk to a Hispanic man, Martin went into his father's house. The police subsequently detained him as he was leaving his father's house. He was handcuffed and taken to where Huteson was being detained.

About 20 minutes later, three police cars arrived. One of the officers indicated Huteson fit the description of a robbery suspect. Martin testified he asked the officers, "Okay. If he fits the description, why am I here?" The police then checked Martin's identification, which was almost 30 minutes after he had left his father's house.

## CONTENTION

The trial court erred by denying Martin's motion to suppress evidence of the cocaine discovered during his booking search.

3

**DISCUSSION**

Martin contends the cocaine discovered at the station house should have been suppressed under the "fruit of the poisonous tree" doctrine because his detention on the street had been illegal. We conclude that, even if the temporary detention was illegal, the outstanding arrest warrant constituted an independent, untainted ground for Martin's arrest and the cocaine was, therefore, admissible. Hence, the trial court properly denied Martin's suppression motion.

1. *Background.*

At the suppression hearing, the trial court initially said it intended to suppress the cocaine because the police lacked sufficient cause to stop Martin on the street. But after reviewing our Supreme Court's opinion in *People v. Brendlin* (2008) 45 Cal.4th 262, the court concluded the evidence was admissible because the legitimate jailhouse search that flowed from the outstanding arrest warrant was a sufficiently attenuating circumstance: "As I said, I don't think the police officer had reasonable suspicion to detain and seize your client. But in light of all the circumstances, I don't see it as a fishing expedition or . . . acting knowingly unconstitutionally. [¶] It's my understanding that your client was with someone who was a suspect in some other crime. And, of course, once he, the police officer learned of . . . the outstanding warrant . . . there is an intervening circumstance . . . ." The trial court reasoned: "[I]n light of the totality of the circumstances, it seems to me that the officer wasn't just grabbing someone randomly off the street. He stopped your client because your client was associated with someone who was wanted."

2. *Standard of review.*

" 'In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. [Citation.]' [Citation.] In evaluating whether the fruits of a search

4

or seizure should have been suppressed, we consider only the Fourth Amendment's prohibition on unreasonable searches and seizures. [Citation.]" (*People v. Brendlin, supra,* 45 Cal.4th at p. 268.)

3. *There may have been a valid* <u>Terry</u> *stop.*

Although the trial court relied on the attenuation of an initial illegality to admit the evidence, on appeal the Attorney General contends the evidence could also have been properly admitted on the ground the temporary detention was lawful. This is a close question.

a. *Legal principles.*

The seminal case in the area of stop-and-frisk detentions is *Terry v. Ohio* (1968) 392 U.S. 1 [88 S.Ct. 1868], which said: "[W]e deal here with an entire rubric of police conduct – necessarily swift action predicated upon the on-the-spot observations of the officer on the beat – which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. [¶] Nonetheless, the notions which underlie both the warrant procedure and the requirement of probable cause remain fully relevant in this context. . . . [I]t is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' [Citations.] And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (*Id*. at pp. 21-22, fns. omitted.)

"The guiding principle in determining the propriety of an investigatory detention is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' [Citations.] In making our determination, we examine 'the totality of the circumstances' in each case. [Citations.] [¶] Reasonable suspicion is a lesser standard than probable cause, and can arise from less reliable information than required for probable cause, including an anonymous tip. [Citation.] But to be reasonable, the officer's suspicion must be supported by some specific, articulable facts that are 'reasonably "consistent with criminal activity." ' [Citation.] The officer's subjective suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." [Citation.]' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

b. *Discussion*.

Citing *Ybarra v. Illinois* (1979) 444 U.S. 85 [100 S.Ct. 338], Martin argues his detention was illegal because Detective Cadena "did not testify that he had any prior knowledge of appellant or suspicion that he was involved in criminal activity. Appellant was merely 'with someone who was [mistakenly thought to be] a suspect in some other crime.' This was the sole justification for appellant's detention. There is no indication in the record that the grand theft auto from the day before was committed by more than one person, let alone that appellant fit the description of a perpetrator of that crime."

In *Ybarra*, officers looking for evidence of drug trafficking executed a search warrant naming the Aurora Tap Tavern as the place to be searched and a bartender named Greg as the person to be searched. Upon entering the tavern, the officers advised all those present they would be frisked for weapons. Ybarra, who was standing in front of a pinball machine, was found to be in possession of heroin. The Supreme Court held Ybarra's search had been illegal because the officers lacked "probable cause to believe that any person found on the premises of the Aurora Tap Tavern, aside from 'Greg,'

6

would be violating the law. The search warrant complaint did not allege that the bar was frequented by persons illegally purchasing drugs. It did not state that the informant had ever seen a patron of the tavern purchase drugs from 'Greg' or from any other person. Nowhere, in fact, did the complaint even mention the patrons of the Aurora Tap Tavern." (*Ybarra v. Illinois, supra,* 444 U.S. at p. 90, fn. omitted.) *Ybarra* declared that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. [Citation.]" (*Id.* at p. 91.)

The Attorney General argues Martin's situation was fundamentally different from Ybarra's. "Here, the officer observed someone (Huteson) fitting a very unique and specific description of a criminal suspect, i.e., an African-American male with dreadlocks, milling about the very location of the crime that occurred a day earlier. Under these circumstances, there was certainly a sufficient basis to detain Huteson for purposes of determining whether he in fact was the perpetrator of an earlier crime. Because the criminal suspect was accompanied by one additional person, due to officer safety issues and due to the need to determine what criminal connections appellant may have as to Huteson, the officers had reasonable basis to also detain appellant." "Furthermore, Detective Cadena saw appellant and Huteson briefly meet another person on the street and saw that person hand Huteson an object. While this may not have sufficed to justify the detention by itself in the absence of evidence regarding the nature of the object, this certainly contributed to the totality of the circumstances the officers observed, supporting a reasonable suspicion of criminal activity."

The Attorney General cites *People v. Glasser* (1995) 11 Cal.4th 354, a case where officers were executing a search warrant at a suspected drug house when the defendant drove up, parked in the driveway and started to walk through a gate into the backyard. Although the officers did not recognize the defendant as someone connected to the residents, he "appeared to be more than a stranger or casual visitor" (*id.* at p. 365) and he was detained. *Glasser* held the detention "was justified by the need to determine

7

defendant's identity and connection to the premises and to protect the officers' own safety." (*Id*. at p. 360.)

In the case at bar, the officer safety factor could have been triggered in two ways. Huteson's interaction with the Hispanic man might have been a drug transaction, and given Cadena's testimony that Martin and Huteson were together the whole time, Martin was arguably a drug suspect. Drug-related crimes are classic examples of inherently violent situations in which investigating officers are legitimately concerned about their safety. (See *Ybarra v. Illinois, supra,* 444 U.S. at p. 106 [firearms are "tools of the trade" in the drug business]; *People v. Glasser, supra,* 11 Cal.4th at p. 367 ["The police interest in protecting against violence during the search of a home for narcotics has been widely recognized."].) The same concern might also have been triggered by the suspicion Huteson and Martin had both been involved in the auto burglary. *People v. Osborne* (2009) 175 Cal.App.4th 1052, pointed out that auto burglary, although not a classic violent felony, raised safety concerns: "The burglary cases . . . are most instructive to the current case, as they point out that not only may an individual suspected of such a crime reasonably be anticipated to be armed with a weapon (such as a knife or a firearm), but also may reasonably be expected to possess 'tools of the trade' such as screwdrivers and pry tools, which may easily be used as weapons. . . . [¶] A similar analysis holds true for automobile burglary and automobile theft suspects, as they use tools that can readily be used as weapons." (*Id*. at pp. 1060-1061.)

However, we need not determine the legality of Martin's initial detention. As we will explain, *post*, the trial court properly denied the suppression motion because any taint from an illegal pedestrian stop was sufficiently attenuated by the subsequent discovery of Martin's outstanding arrest warrant.

4. *Any illegality in Martin's initial detention was sufficiently attenuated by the outstanding arrest warrant.*

We agree with the Attorney General that, even if Martin's initial detention had been illegal, the trial court correctly denied his suppression motion because the illegality was subsequently attenuated. As our Supreme Court held in *People v. Brendlin, supra,* 45 Cal.4th 262: "Case law from other state and federal courts uniformly holds that the *discovery of an outstanding arrest warrant prior to a search incident to arrest constitutes an intervening circumstance that may – and, in the absence of purposeful or flagrant police misconduct, will – attenuate the taint of the antecedent unlawful traffic stop.* We join this chorus of cases and reverse the judgment of the Court of Appeal, which had ordered suppression of the evidence seized from defendant's person and from the vehicle in which he was a passenger on the sole ground that the outstanding warrant would not have been discovered '[b]ut for the unlawful vehicle stop.' " (*Id.* at p. 265, italics added.)

*Brendlin* explained:

" ' "[N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " ' [Citations.] '[B]ut-for cause, or "causation in the logical sense alone," [citation] can be too attenuated to justify exclusion. . . .' [Citations.]

"Although the significance of an arrest warrant in attenuating the taint of an antecedent unlawful traffic stop is an issue of first impression for this court, the general framework for analyzing a claim of attenuation under the Fourth Amendment is well settled. [Citation.] '[T]he question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' [Citation.] . . .

"Where, as here, the issue is whether the discovery of an outstanding arrest warrant has attenuated the taint of an antecedent unlawful seizure, other state and federal courts have likewise invoked the three *Brown* factors [citing *Brown v. Illinois* (1975) 422 U.S. 590, 592 (95 S.Ct. 2254)] – i.e., the temporal proximity of the unlawful seizure to the subsequent search of the defendant's person or vehicle, the presence of intervening circumstances, and the flagrancy of the official misconduct in effecting the unlawful seizure. [Citations.]" (*People v. Brendlin, supra,* 45 Cal.4th at pp. 268-269.)

In *Brendlin*, an officer spotted a car being driven by Karen Simeroth with expired registration tags. The officer learned by radio a renewal application was in process and he could see a valid temporary operating permit taped to the rear window of the car. However, he could not tell if the permit matched the car, so he made a traffic stop to investigate further. The officer asked Simeroth for her license and asked her passenger, defendant Brendlin, to identify himself. During this query, the officer saw drug-related contraband in the car. The officer then learned by radio that defendant was a parolee with an outstanding arrest warrant. The Court of Appeal suppressed evidence found on defendant and in the car on the rationale that, because the officer had only a mere hunch the car was unregistered, the traffic stop was illegal.

Applying the three *Brown* factors, *Brendlin* held there was sufficient attenuation to admit the evidence. Although a close temporal proximity between the illegal detention and the subsequent search usually militates against an attenuation finding,[1] "where the intervening circumstance is a lawful arrest under an outstanding arrest warrant, the defendant's conduct is irrelevant, and the police cannot be said to have exploited the illegal seizure that preceded the discovery of the outstanding warrant." (*People v. Brendlin, supra,* 45 Cal.4th at p. 270.) *Brendlin* then explained: "Accordingly, some courts have held that the first *Brown* factor is not relevant to the attenuation of the taint of

---

[1]      For instance "where the alleged intervening factor between the illegal police conduct and the challenged evidence was a volitional act by the defendant, such as resisting arrest or flight." (*People v. Brendlin, supra,* 45 Cal.4th at p. 270.)

10

an antecedent illegal seizure where the intervening circumstance is an outstanding arrest warrant. [Citations.] Other courts have reasoned that the first *Brown* factor is nonetheless relevant (and tends to favor suppression of the evidence) but is not dispositive. [Citations.] We need not decide which line of authority is correct because even the courts in the latter category 'have all but unanimously concluded that, in this kind of situation, this first *Brown* factor is outweighed by the others.' [Citation.]" (*Ibid.*)

  *Brendlin* went on to explain: "As to the second *Brown* factor, the case law uniformly holds that an arrest under a valid outstanding warrant – and a search incident to that arrest – is an intervening circumstance that tends to dissipate the taint caused by an illegal traffic stop. . . . The challenged evidence was thus the fruit of the outstanding warrant, and was not obtained through exploitation of the unlawful traffic stop. [Citation.] [¶] The third *Brown* factor, the flagrancy and purposefulness of the police misconduct, is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule – deterring police misconduct.' [Citations.] Defendant contends that the illegality here was flagrant in that Deputy Brokenbrough 'had no reasonable suspicion that any occupant of the vehicle had violated the law when he made the traffic stop' and that he had at most 'a hunch' the driver was operating an unregistered vehicle. But a mere 'mistake' with respect to the enforcement of our traffic laws does not establish that the traffic stop was pretextual or in bad faith. [Citations.] Deputy Brokenbrough testified that he ordered the traffic stop in order to investigate the vehicle's registration, that he did see the temporary sticker in the rear window prior to the stop, but that (in his experience) such stickers sometimes belonged to a different vehicle or had been falsified. Although the People have conceded that this was insufficient to justify a temporary detention to permit further investigation, the insufficiency was not so obvious as to make one question Deputy Brokenbrough's good faith in pursuing an investigation of what he believed to be a suspicious registration, nor does the record show that he had a design and purpose to effect the stop 'in the hope that something [else] might turn up.' [Citations.] In particular, there is no evidence at all that the deputy 'invented a justification for the traffic stop in order to have an excuse to run [a] warrant

11

check[]' [citation] or that a search of the vehicle or its occupants was the 'ultimate goal' of the initial unlawful detention. [Citations.]" (*People v. Brendlin, supra,* 45 Cal.4th at pp. 271-272.)

Martin argues his case is different because he "was searched (i.e., pat-searched) before the police discovered the existence of the [arrest] warrant." However, as explained *ante,* such a pat search was probably warranted for reasons of officer safety and, in any event, nothing was found during this pat search. The drugs were not discovered until Martin's subsequent booking search at the police station. Martin asserts Cadena had absolutely no reason to suspect he was involved in the auto burglary or any other crime. Not so; the trial court reasonably concluded Cadena suspected Martin might have been Huteson's accomplice.

Martin's reliance on the facts in *Brown v. Illinois, supra,* 422 U.S. 590, is misplaced. There the defendant came home to find two police detectives inside his residence. The detectives had "broke[n] into his apartment, searched it, and then arrested Brown, all without probable cause and without any warrant, when he arrived. They later testified that they made the arrest for the purpose of questioning Brown as part of their investigation of the murder of a man named Roger Corpus." (*Id.* at p. 592.) There was no attenuation in *Brown* because the entire point of arresting the defendant had been the chance the detectives might find incriminating evidence for their on-going investigation. Here, on the other hand, the reason for Martin's detention was his apparent connection to Huteson, not because Catena had some independent ulterior motive for investigating Martin. And even if that connection was insufficient to justify a *Terry* stop, it was enough to demonstrate Catena had not been acting in bad faith.

The trial court properly held the drug evidence was admissible because the discovery of Martin's outstanding arrest warrant attenuated any taint caused by an illegal temporary detention.

12

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



KITCHING, J.



ALDRICH, J.


13