# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 8, 2013

## STATE OF TENNESSEE v. ANTONIO MARQUES PEEBLES

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1205    Cheryl A. Blackburn, Judge**

---

**No. M2012-02148-CCA-R3-CD - Filed January 24, 2014**

---

The defendant, Antonio Marques Peebles, appeals his Davidson County Criminal Court jury conviction of aggravated robbery, claiming that the trial court erred by denying his motion to suppress the statements he made to law enforcement officers and the evidence obtained following his arrest, that the evidence was insufficient to support his convictions, and that the sentence imposed was excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Emma Rae Tennent (on appeal); and Chad Hindman and J. Michael Engle (at trial), Nashville, Tennessee, for the appellant, Antonio Marques Peebles.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Bret Gunn and Megan King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In April 2011, the Davidson County grand jury charged the defendant, as well as Edward Dewayne Weeks,[1] with one count of aggravated robbery. The trial court conducted a jury trial on June 18 and 19, 2012.

---

[1]Mr. Weeks testified at trial that his last name was spelled "Weekes" rather than "Weeks." Nothing in the record indicates that the indictment, which says "Weeks," was amended. As is the policy of this court, we utilize the spelling contained in the indictment.

At trial, Heidi Arana, the victim, testified that, on February 1, 2011, she was employed with ServiceSource, which was located in an office building on the corner of 3rd Avenue and Church Street in downtown Nashville. At 4:30 p.m., she left work and walked to a grocery store which was located across the street from her office building. After making her purchases, Ms. Arana walked to a parking garage on 7th Avenue, across the street from the Nashville Public Library. As she was crossing 7th Avenue, Ms. Arana noticed two youths run across the street ahead of her and into the parking garage. Due to the garage's proximity to a nearby high school, Ms. Arana thought nothing of it.

When Ms. Arana entered the garage, she proceeded down a hallway that led to an elevator. Just before Ms. Arana reached the elevator, a hand reached out from a recessed area and grabbed Ms. Arana's shoulder, pulling her out of the hallway and against a wall. As this person was holding Ms. Arana against the wall, another person stepped around Ms. Arana and blocked the exit.

Ms. Arana described the man who grabbed her as a slender, African-American man, approximately five feet, six inches in height. She testified that he was wearing a "brown puffy quilted type jacket" with a fur-lined hood. The second man was also a thin African-American man, wearing dark clothing and standing between five feet, eight inches and five feet, 10 inches tall. She estimated that both men were between the ages of 16 and 19.

The man who grabbed Ms. Arana told her to "give it up, we know you got something." The other man made similar statements. When Ms. Arana insisted that she had nothing to give them, the man in dark clothing stated, "[D]on't be stupid," while partially pulling a gun out of his right front coat pocket. Ms. Arana described the gun as black and stated that it appeared to be an automatic weapon. At that point, Ms. Arana unzipped her handbag and gave them all the cash she had, a five-dollar bill and two one-dollar bills. The man in the brown coat grabbed the money from her handbag, and the two men ran down the hallway and out of the parking garage.

After the men had exited the parking garage, Ms. Arana ran down the hallway after them and watched the men run across 7th Avenue and head north toward Church Street. Ms. Arana immediately called 9-1-1 from her cellular telephone. While she was speaking with the 9-1-1 operator, two women entered the parking garage, and Ms. Arana informed them that she had just been robbed at gunpoint. The women ran out of the garage to flag down a nearby police officer. The officer entered the garage while Ms. Arana was still on the telephone, and the officer overheard Ms. Arana's description of the assailants. Approximately 10 minutes later, the officer informed Ms. Arana that officers had suspects in custody that fit the descriptions she provided. Ms. Arana told the officer that she was

certain she could identify the man wearing the brown puffy coat because "he was the one that my face was focused on" throughout the robbery.

The police officer drove Ms. Arana to a new bus station located at 5th Avenue and Deaderick Street, where Ms. Arana saw police officers standing in front of the bus station with two suspects. Ms. Arana immediately identified the man in the puffy brown coat, later identified as Edward Dewayne Weeks, as one of the men who robbed her. Ms. Arana stated that she did not identify the other man at the show-up. She testified that, although she had seen the face of the other robber, she had been so focused on the handgun that "everything else just left."

Ms. Arana next saw the two robbery suspects at a preliminary hearing, where they were seated with their defense attorneys. Ms. Arana again identified Mr. Weeks as the robber in the puffy brown coat, but she did not identify the defendant as one of the robbers. At trial, Ms. Arana identified, for the first time, the defendant as the robber who had been dressed in dark clothing, stating the following:

> When I was sitting in the back of the courtroom and he turned and he looked, I instantly went back to that moment when the gun was pulled out. And looking at his face – when you've been through something like that, you don't forget. It comes back. That is the gentleman. I'll stake my life on it.

On cross-examination, Ms. Arana denied being angry about the robbery and instead testified that she was scared, explaining that she no longer works or even visits downtown Nashville and refuses to park in parking garages. With respect to her description of the robbers, Ms. Arana admitted that she described both robbers to the 9-1-1 operator as standing five feet, five inches in height, which would have made them both shorter than she was, at five feet, six inches, even though she believed them both to be taller than but close to her height. Ms. Arana also admitted that, at the preliminary hearing, she described the robber with the gun as being tall and wearing dark clothing. At the hearing, she was asked if she saw that man in the courtroom, and Ms. Arana responded that she "did not look at his face" because she was only focused on the gun.

Ms. Arana admitted that, during her 9-1-1 call, she described the robber with the gun as wearing "a blue sweatshirt type hoodie" and "a black jacket." At trial, Ms. Arana clarified that she just recalled the man wearing dark clothing.

Officer Gerald Gomes with the Metro Nashville Police Department ("Metro") testified that he was on patrol on 7th Avenue North in the vicinity of Church Street when a

-3-

citizen flagged him down and told him that a woman in a nearby parking garage had just been robbed. As Officer Gomes stepped out of his patrol car to walk to the garage, he overheard a call on his police radio that a woman had just been robbed in that garage. When he arrived at the garage at approximately 4:50 p.m., Ms. Arana was still speaking with the 9-1-1 operator. Ms. Arana described the two suspects as young black males between the ages of 15 and 17. She described the man with the gun as "skinny," weighing between 130 and 140 pounds, standing a bit taller than she, and wearing a black jacket. She described the second robber as standing a bit shorter than the first and wearing a "tan puffy parka style jacket with a fur trimmed hood." Ms. Arana indicated to Officer Gomes that the men had run in the direction of the old courthouse, which was located approximately three blocks northeast of the 5th Avenue bus station. Officer Gomes gave Ms. Arana's description to dispatch to send out over the police radio, and at least three units responded immediately.

Less than 10 minutes later, Officer Chris Clark responded over the radio that he had located two suspects matching the description provided by Ms. Arana in the vicinity of 5th Avenue and Deaderick Street, which was two blocks north and two blocks east of the parking garage. Officer Gomes drove Ms. Arana to that location, and as he turned the patrol car onto Deaderick, Ms. Arana "blurted out without my having to ask that she did, in fact, recognize one of the suspects as being . . . one of the individuals that had robbed her." Officer Gomes clarified that the man she recognized was the one wearing the puffy brown jacket.

Metro Officer Chris Clark testified that he was on patrol in downtown Nashville on February 1, 2011, when he heard the call on his police radio for the two robbery suspects who were heading in the direction of the courthouse. Because it was raining and was close to 5:00 p.m., Officer Clark thought that the suspects might head toward the bus station, so he parked his police cruiser at the station on the corner of 5th Avenue and Deaderick, and he waited. A few minutes later, Officer Clark spotted two men matching the suspects' description walking north on 5th Avenue. Officer Clark testified that the two men noticed his police cruiser and that they watched him while they crossed the intersection. Officer Clark notified his fellow officers that he thought he had the two suspects, and he then intercepted the men at the corner of 5th and Deaderick. Officer Clark patted them down, and he and another officer detained the suspects until Officer Gomes arrived with Ms. Arana for the show-up. Once Ms. Arana had identified Mr. Weeks as the man in the puffy coat, Officer Clark and Metro police officers arrested both Mr. Weeks and the defendant. Officer Clark transported the defendant to booking, and while en route, Officer Clark stated, "[M]an, there's cameras everywhere downtown. I mean, you can't do anything downtown without being watched," to which the defendant replied, "[Y]ou knew it was us the whole time then." The defendant then inquired if his "bond would be lower because the gun wasn't real."

-4-

When Officer Clark arrived at booking with the defendant, Officer Gomes was present with Mr. Weeks. While the defendant and Mr. Weeks were in a holding cell, the defendant pulled two crumpled dollar bills out of his pocket and placed them in his wallet. Mr. Weeks observed this action and then commented, "[M]an, they took my money at the station," to which the defendant responded, "[W]ell, this is my money now."

Officer Clark testified that the arrest report for Mr. Weeks indicated that, at the time of the robbery, he was 18 years of age, weighed 140 pounds, and was five feet, eight inches tall. The defendant's arrest report stated that he was 18 years of age, weighed 150 pounds, and was six feet tall.

On cross-examination, Officer Clark stated that both Mr. Weeks and the defendant were standing together under an umbrella with Metro Officer McKay when Officer Gomes drove past with Ms. Arana. Officer Clark agreed that it was not unusual to see many young people downtown, particularly with a high school located in the downtown area. Officer Clark also agreed that a black or dark "hoodie" or hooded sweatshirt is "not an unusual thing to see a young black man wearing." Officer Clark explained, however, that in addition to the men matching the descriptions of the suspects, the look of surprise on their faces when they spotted him sitting in his patrol car outside the bus station was what really "tweaked [his] suspicion." Officer Clark described the suspects as having "a deer in the headlight look" and noticed that the suspects "didn't take their eyes off" of him as they crossed the intersection.

In response to questioning about the two dollars that the defendant took out of his pocket while in the holding cell with Mr. Weeks, Officer Clark confirmed that he did not seize the defendant's two dollars because he did not know whether the money was stolen during the robbery or was the defendant's money prior to the robbery.

Metro Detective Robert Anderson testified that he investigated the robbery of Ms. Arana on February 1, 2011. Detective Anderson identified a puffy brown jacket and a five-dollar bill collected from the person of Mr. Weeks at the time of his arrest. Detective Anderson also identified two black hooded sweatshirts, one with a design print, collected from the person of the defendant on February 1. Detective Anderson testified that his investigation revealed that the 7th Avenue parking garage had no video surveillance cameras, and the cameras across the street at the library were aimed straight down to only capture employees entering and leaving the building.

On cross-examination, Detective Anderson admitted that he was unsure if the defendant was wearing both hooded sweatshirts at the time of his arrest or if both sweatshirts were simply in his possession. Detective Anderson confirmed that both sweatshirts were

black rather than blue, and he admitted that one of the sweatshirts contained red and gold trim.

Metro Officer Deborah Phillips testified that, on February 1, 2011, she was working a plain-clothes assignment at a Nashville Predators hockey game at Bridgestone Arena, which was approximately one block south and one block east of the 7th Avenue parking garage. When she heard the call over the police radio about the robbery, she and her partner proceeded directly to the scene. Upon arrival, Officer Phillips entered the library, where she noticed two young black men closely matching the description of the suspects although she did not notice a fur-lined hood on the brown coat. The men "were coming from the parking garage entrance" into the library. Officer Phillips observed the two men "fairly well for a length of time." When Officer Phillips learned a short time later that two men had been taken into custody in connection with the robbery, she proceeded to the bus station and confirmed that the two men in custody were the same two men she had observed at the library shortly after the robbery had been committed. Upon seeing Officer Phillips at the bus station, the defendant stated that he had seen her in the library and inquired whether she was a police officer. Officer Phillips later noticed a fur-lined hood in the pocket of Mr. Weeks's pants. She also recovered, with the assistance of Mr. Weeks, a BB gun from a flower bed outside the library.

On cross-examination, Officer Phillips admitted that she had prepared a supplemental report on February 28, 2011, documenting the discovery of the gun but that the report mentioned nothing about seeing the defendant and Mr. Weeks in the library or hearing any statements made by the defendant.

Metro Crime Scene Investigator Felicia Evans testified that she was called to 7th Avenue and Church Street on the evening of February 1 to photograph and process a BB gun located in a flower bed among tall grass. Ms. Evans processed the gun for fingerprints but was unable to recover any. Ms. Evans identified the gun at trial as a Marksman Repeater BB gun and testified that it was "non functional at the time."

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify but did choose to present proof.

Edward Weeks testified that, on February 1, 2011, he rode a bus downtown to visit the library and use its public computers. Mr. Weeks stated that he had met the defendant for the first time one week earlier at the library. Mr. Weeks admitted that he had robbed Ms. Arana on February 1 and that he had previously pleaded guilty to that crime, but

he testified that the defendant did not commit the robbery with him. Mr. Weeks claimed that another person, who was wearing "a black hoodie" and whose name he did not know, assisted him in robbing Ms. Arana. Following the robbery, both Mr. Weeks and the unknown robber crossed 7th Avenue, at which point Mr. Weeks and the robber "split up," with Mr. Weeks turning north toward Church Street. Mr. Weeks testified that he did not know where his accomplice went and that he did not see him again after they crossed the street. Mr. Weeks stated that he encountered the defendant after the library closed at 5:00 p.m. and that the defendant accompanied him to the bus terminal. Mr. Weeks admitted that, at the time of his arrest, he informed law enforcement officers that the defendant had committed the robbery with him. When asked why he had lied, Mr. Weeks claimed that he thought it would shorten the length of his sentence. Mr. Weeks testified that, on November 10, 2011, he testified in court under oath that the defendant was not involved in the robbery, and Mr. Weeks wrote and mailed a letter to the District Attorney's office on May 18, 2012, also stating that the defendant did not commit the robbery with him.

On cross-examination, Mr. Weeks stated that he encountered the defendant as they were both walking toward the bus station, but the testimony was unclear as to exactly where he met the defendant. Mr. Weeks acknowledged that he stated, on multiple occasions during his initial police interview, that the defendant had committed the robbery with him, that the defendant had grabbed Ms. Arana, and that the defendant had a gun. Mr. Weeks also acknowledged that, when he entered his guilty plea on June 14, 2012, he admitted that he committed the robbery with the defendant.

Based on this evidence, the jury convicted the defendant as charged of aggravated robbery. Following a sentencing hearing, the trial court imposed a sentence of 10 years.

*I. Motion to Suppress*

The defendant contends that the trial court erred by denying his motion to suppress both statements he made and other evidence obtained following his arrest on February 1, 2011. Specifically, the defendant claims that the seizure of the defendant was not supported by reasonable suspicion and that officers lacked probable cause to arrest him.

At the hearing on the defendant's motion to suppress, Officer Gomes testified that Ms. Arana described the suspects to him as "two young male blacks," between the ages of 15 and 17. She told Officer Gomes that one of the men "was wearing a black jacket and that he was a little taller than she was and skinny," estimating his weight to be between 130 and 140 pounds. She also stated that this man in the black jacket had a gun. She described the second suspect as "a little shorter than the first" and stated that he was wearing "a tan

puffy parka style jacket with a fur trimmed hood." Officer Gomes released this description of the suspects over the police radio and included the fact that Ms. Arana indicated that the suspects had fled in the direction of the courthouse. Less than 10 minutes later, Officer Gomes learned that suspects matching the released description had been located at the 5th Avenue bus station. Officer Gomes drove Ms. Arana to that location, where she immediately identified Mr. Weeks, who was wearing a tan puffy jacket, as one of the men who had robbed her. Prior to the show-up, Ms. Arana had informed Officer Gomes that she could "definitely" recognize the robber in the tan jacket but that she did not "get a real good look at" the man holding the gun. Using a map of downtown Nashville, Officer Gomes identified the 7th Avenue parking garage, the 5th Avenue bus terminal, and the courthouse, stating that "[i]t's a relatively straight line from the parking garage on the way to the courthouse where 5th and Deaderick is, where [the suspects] were located."

Officer Chris Clark testified that he spotted two suspects who fit the "description to a T" near the 5th Avenue bus station shortly after hearing the call on the police radio. Officer Clark stated that the suspects were young, black men, one of whom was wearing "a black hoodie" and the other was wearing a tan parka. Officer Clark testified that the height and weight descriptions matched the suspects as well. Officer Clark approached and detained the suspects until Officer Gomes arrived with Ms. Arana for a show-up. Following Ms. Arana's identification of Mr. Weeks, Officer Clark arrested Mr. Weeks and the defendant. Officer Clark noted that both men were 18 years of age and acknowledged that Mr. Weeks was shorter than the defendant. While Officer Clark was transporting the defendant to the jail, the defendant stated, "[Y]ou knew it was us the whole time," after Officer Clark had mentioned the prevalence of police cameras downtown. The defendant also inquired whether the bond would be lower because the gun was not real. During booking, Officer Clark observed the defendant take two dollars out of his pocket and place the bills in his wallet, which prompted Mr. Weeks to comment that the officers had taken his money at the police station. The defendant responded, "[T]his is my money now." Officer Clark clarified that these statements were made spontaneously and not as a result of any questioning on his part.

On cross-examination, Officer Clark stated that, when he made contact with the defendant and Mr. Weeks on the corner of 5th Avenue and Deaderick Street, he patted both of them down to check for weapons. The defendant stated that he "didn't have any drugs on him," to which Officer Clark responded, "[G]ood, that's not what I was looking for." Another officer approached with an umbrella, and, because it was raining, Officer Clark asked that officer to stand with the two suspects while he used their driver's licenses to check their criminal history.

The trial court, in a thorough and well-reasoned order, denied the defendant's

motion to suppress, finding, first, that law enforcement officers possessed reasonable suspicion to stop the defendant and Mr. Weeks for both an investigation and the ensuing show-up:

> Although [defense] counsel made issue of the color of the coat given during the 911 call, as the Court pointed out during the hearing, when Ms. Arana provided her description she stated one suspect "was wearing a blue sweatshirt type hoodie" and shortly thereafter when asked about the gunman, she reiterated "the one in the blue sweatshirt. Blue sweatshirt and I believe he was wearing . . . he was wearing a black jacket." . . . During the Preliminary Hearing, Ms. Arana described the gunman's clothing as "an all black, all navy hoodie jacket" and "dark blue, dark black." . . . Additionally, Officer [Gomes] testified that after Mr. Arana disconnected from 911, she . . . described the gunman to him as wearing a black hoodie, which is what he relayed over the radio. Both Ms. Arana's Preliminary Hearing testimony and Officer [Gomes]'s Preliminary Hearing as well as suppression hearing testimony show that her description of the robbers included not only a description of their outerwear but their approximate age, height, weight as well as their race and directional flight. Officer [Clark] testified that within five to ten minutes of hearing the description [on] the radio he spotted the Defendants, which he described as matching the radioed description "to a tee," coming . . . towards the downtown bus terminal.

Turning to the issue of probable cause, the trial court disagreed with the defendant's position that his proximity to Mr. Weeks at the time of Ms. Arana's identification of the latter suspect was effectively the only evidence tying the defendant to the robbery:

> While Ms. Arana was unable to identify the gunman, she had reported to 911 as well as the on-site officer that she had been approached by two men who robbed her; she provided descriptions of both robbers to the police, the officer stopping [the defendant and Mr. Weeks] testified that he observed the suspects within five to ten minutes of receiving the information and he spotted them a few blocks from the crime scene . . . coming from the reported direction and they matched the physical and clothing descriptions radioed "to a tee," and Ms.

Arana was able to identify Mr. [Weeks] as one of the robbers even though she stated she would be unable to identify the gunman. All of this information considered together – which exceeds the vague description provided in the cited [*State v. Gutierrez*, No. M2007-02064-CCA-R9-CO (Tenn. Crim. App., Nashville, Mar. 25, 2009), *perm. app. denied* (Tenn. Aug. 24, 2009)] case – provides probable cause for the police to arrest both Defendants to take them in for further questioning. . . . Since the Court found that Defendant was lawfully arrested and detained, there is no basis to suppress Defendant's statements or the money observed on him. The Court further notes that Defendant's statements to Officer Clark during transport to booking were voluntarily made after he had been read his <u>Miranda</u> rights and submitted to a police interview conducted by other officers.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Police officers are constitutionally permitted to conduct a brief investigatory stop supported by specific and articulable facts leading to reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2002). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective, analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal activity that is required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993). The objective facts on which an officer relies may include his or her own

observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

Relevant to the subsequent arrest of the defendant, we note that "[p]robable cause in the context of a warrantless arrest 'exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense."'" *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000) (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964))).

In the instant case, we conclude that the record supports the trial court's finding that law enforcement officers had reasonable suspicion to detain the defendant for the show-up. Considering the totality of the circumstances, it is clear that the seizure of two men closely matching the description of suspects who had, within the prior 15 minutes, committed the armed robbery of Ms. Arana was reasonable and served the public interest. The brief detention of the defendant and Mr. Weeks outside the bus station – under an umbrella, no less – while waiting for Officer Gomes to arrive with Ms. Arana for the show-up was minimally intrusive. Officer Clark heard the description of the two suspects over his police radio, and moments later, he spotted men who matched that description "to a T." Thus, reasonable suspicion existed to justify the detention of the defendant.

With respect to the issue of probable cause, we likewise conclude that the evidence supports the trial court's finding that law enforcement officers had probable cause to arrest the defendant. The defendant posits, as he did before the trial court, that, because Ms. Arana failed to identify the defendant as one of the robbers, the only basis for his arrest was his association with Mr. Weeks, and probable cause requires individualized suspicion. *See State v. Richards*, 286 S.W.3d 873, 880 (Tenn. 2009); *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (stating that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person") (citation omitted). In support of his argument, the defendant relies primarily on *State v. Jose Noe Gutierrez*, No. M2007-02064-CCA-R9-CO (Tenn. Crim. App., Nashville, Mar. 25, 2009), *perm. app. denied* (Tenn. Aug. 24, 2009), in which this court upheld the trial court's suppression of evidence on the basis that probable cause to arrest the defendant did not exist. In that case, the only evidence tying the defendant to the scene of the crime was the presence of his vehicle at the crime scene, as well as his vague resemblance to one of the suspects. *Id.*, slip op. at 10. The defendant was, in fact, taller than the suspect and had a different haircut. *Id.*, slip op. at 4-5. "[G]iven the tenuous nature of the evidence linking the defendant to the crime, we agree with the trial court that the

evidence was insufficient to establish probable cause to warrant his arrest." *Id.*, slip op. at 10. In the case at bar, the defendant contends that the evidence linking him to the robbery of Ms. Arana is similarly tenuous. As did the trial court, we disagree.

Given her very brief and certainly frightening encounter with her robbers, Ms. Arana gave a notably thorough description of both men, describing their race, approximate age, height, weight, and clothing, and the direction in which they fled. Approximately 10 minutes later, Officer Clark saw two young black men who matched this description "to a T" approaching the bus station, which was located between the parking garage and the courthouse, and shortly thereafter, Ms. Arana positively identified Mr. Weeks as one of the robbers. Taken together, this information was "sufficient to warrant a prudent man in believing that the [defendant] had committed" the robbery of Ms. Arana. *Lewis*, 36 S.W.3d at 98 (citations omitted).

Because reasonable suspicion existed to detain the defendant for the show-up and because the defendant's arrest was supported by probable cause, no basis existed to suppress the defendant's statements or the evidence related to the crime, and as such, we find no error in the trial court's denial of the defendant's motion to suppress.

## *II. Sufficiency*

The defendant next contends that the evidence is insufficient to support his conviction of aggravated robbery, arguing specifically that the State failed to prove his identity as one of the robbers. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable

and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . or . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-402(a).

Here, the proof adduced at trial established that Ms. Arana was accosted by two young black males inside a parking garage. The man who grabbed her was wearing a brown puffy jacket with a fur-lined hood, and the other man, who was a few inches taller, was wearing dark clothing. The man in the puffy jacket demanded that Ms. Arana "give it up," and the man in dark clothing instructed, "[D]on't be stupid," while pulling a gun out of his coat pocket. Although it was later revealed that the gun was not a firearm but was, in fact, an inoperable BB gun, the statute only requires that the victim "reasonably believe it to be a deadly weapon." *See* T.C.A. § 39-13-402(a). Ms. Arana opened her handbag and gave the defendants seven dollars in cash: one five-dollar bill and two one-dollar bills. Ms. Arana watched the perpetrators flee from the garage in the direction of the courthouse. She immediately called 9-1-1 and, while describing the robbers to the 9-1-1 operator, Officer Gomes arrived. Ms. Arana then gave a description of the suspects to Officer Gomes, who released that description over the police radio. Officer Phillips spotted two suspects in the library a few minutes later who matched the description, and less than 10 minutes later, Officer Clark noticed two suspects who matched the radioed description "to a T." Officer Clark detained the suspects until Officer Gomes arrived with Ms. Arana for the show-up. After Ms. Arana identified Mr. Weeks as the robber in the brown puffy jacket, officers arrested both Mr. Weeks and the defendant. The defendant noticed Officer Phillips at the bus station and told her that he had seen her in the library and asked whether she was a police officer. The defendant later stated to Officer Clark that the officer "knew it was us the whole time" and asked Officer Clark if his bond would be lower given the fact that the gun was not real. Following booking, Officer Clark watched the defendant remove two one-dollar bills from his pocket and place them in his wallet. When Mr. Weeks remarked that the officers had taken his money (revealed to be a five-dollar bill by Detective Anderson) earlier, the defendant responded that "this is [his] money now." Although Ms. Arana was unable to identify the defendant at the show-up or the preliminary hearing, she positively identified the defendant at trial as the man with the gun who robbed her, stating that "when you've been through something like that, you don't forget. It comes back." Although Mr. Weeks testified at trial that a man whose name he did not know – and not the defendant – committed the robbery with him, the jury heard this testimony and clearly rejected it, as was their prerogative.

Affording the State the strongest legitimate view of the evidence and deferring

-13-

to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of aggravated robbery.

### III.  Sentencing

Finally, the defendant challenges the 10-year sentence imposed by the trial court, arguing that the trial court erred by failing to apply the mitigating factor of youth, resulting in an excessive sentence.  In the alternative, the defendant contends that the sentence imposed was not "the least severe measure necessary" and should be reduced.  We disagree.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

In the instant case, the trial court considered all relevant sentencing principles, including the evidence adduced at trial, the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the conduct, enhancing and mitigating factors, statistical information provided by the Administrative Office of the Courts, and the defendant's statement. *See* T.C.A. § 40-35-210(b).  As a Class B felony, the aggravated robbery conviction is sanctioned by a sentencing range of a minimum of eight years and a maximum of 12 years. *See* T.C.A. § 40-35-112(a)(2).  The trial court found a single enhancement factor, that the defendant was adjudicated to have committed aggravated robbery as a juvenile, which would have constituted a felony if committed by an adult. *See*

T.C.A. § 40-35-114(16).  The trial court found that no mitigating factors were applicable, disagreeing with the defendant's position that his youth caused him to lack substantial judgment in committing the offense.  *See* T.C.A. § 40-35-113(6).  In refusing to apply mitigating factor six, the trial court stated that the defense "might have convinced me of that had it not been for the fact he had been convicted of aggravated robbery previously."  "A trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).  For this reason, an appellate court is precluded from reweighing appropriately applied enhancement and mitigating factors.  *See id.* at 344-45.  We find no error in the trial court's refusal to apply the requested mitigating factor.

Moreover, because the defendant was convicted of aggravated robbery, no alternative sentencing was available.  *See* T.C.A. § 40-35-303(a) (stating that "no defendant shall be eligible for probation under this chapter if convicted of a violation of . . . § 39-13-402"); T.C.A. § 40-36-106(a)(1)(B) (stating that persons convicted of felonies "involving crimes against the person as provided in title 39, chapter 13, parts 1-5" are ineligible for community corrections sentencing).  In imposing a 10-year sentence, the trial court acknowledged the lack of availability of alternative sentencing "by virtue of the statute."

Because the trial court properly applied all sentencing principles, the trial court did not abuse its discretion in sentencing the defendant to 10 years' incarceration, and we conclude that the record supports the length of sentence imposed in this case.

*IV.  Conclusion*

The trial court did not err by denying the defendant's motion to suppress.  The evidence is sufficient to support the defendant's conviction, and the trial court did not err in sentencing the defendant.  Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-15-

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE

## STATE OF TENNESSEE v. ANTONIO MARQUES PEEBLES

### Criminal Court for Davidson County
### No. 2011-B-1205

---

### No. M2012-02148-CCA-R3-CD - Filed January 24, 2014

---

## ORDER

The court accedes to the petitioner's request on motion to rehear and will delete from the opinion the paragraph that addressed the petitioner's notice of appeal.

Therefore, it is ORDERED that the opinion in this case filed on November 25, 2013, is withdrawn and is replaced by the revised opinion submitted to the appellate court clerk with this order.

PER CURIAM
(Witt, Wedemeyer, Page, JJ.)